No. 24-13815

IN THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

EBONY KELLEY,

*Plaintiff/Appellant,*

v.

ALLEGIANT AIR, LLC,

*Defendant/Appellee.*

ON APPEAL FROM THE ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
JUDGMENT ENTERED IN THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF FLORIDA
8:23-cv-1162
The Hon. William F. Jung

**PRINCIPAL BRIEF OF APPELLANT EBONY KELLEY**

**CHRISTOPHER S. PRATER**
cprater@pollardllc.com

**POLLARD PLLC**
401 E. Olas Blvd., #1400
Fort Lauderdale, FL 33301
Telephone: 954-332-2380

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Allegiant Air, LLC (Appellee)

Allegiant Travel Company (stock ticker symbol: ALGT)

Boehringer, Michael, Esq.

Flynn, Hon. Sean, United States Magistrate Judge

Ford Harrison, LLP

Kelley, Ebony (Appellant)

Johnson, Viktoriya, Esq.

Jung, Hon. William F., United States District Judge

Pollard PLLC

Pollard, Jonathan, Esq.

Prater, Christopher S., Esq.

Siler-Nixon, Dawn, Esq.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes that this appeal can be resolved on the papers.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ..................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CONTENTS..........................................................................ii

TABLE OF CITATIONS ....................................................................iv

STATEMENT OF JURISDICTION .......................................................vi

STATEMENT OF THE ISSUES ..........................................................1

STATEMENT OF THE CASE................................................................2

    A.   Course of Proceedings and
        Disposition in the Court Below.................................................2

    B.   Statement of the Facts .............................................................6

          **1.** Kelley Joins Allegiant-PIE .................................................6

          **2.** Racial Tensions at Allegiant-PIE .....................................6

          **3.** November 20, 2022 Incident and Subsequent Investigation.............8

          **4.** Kelley Provides a Written Account of Workplace Racism
             and is Suspended four days later .......................................10

          **5.** Kelley Emails Gallagher on December 19, 2022 and is
             Terminated In Retaliation ...............................................12

    C.   Standard of Review .................................................................13

SUMMARY OF THE ARGUMENT ...................................................13

ARGUMENT AND CITATIONS OF AUTHORITY ............................15

I. The District Court Did Not Apply Rule 56 ....................................................15

II. Kelley Proffered Sufficient Circumstantial Evidence to Survive
Summary Judgment .......................................................................................19

    A. Convincing Mosaic...............................................................................19

       1. Suspicious Timing and Ambiguous Statements and
Other Information .............................................................................20

       2. 'Me Too' Evidence and Systematic Better Treatment
of Similarly Situated Employees.......................................................22

    B. *McDonnell Douglas* .............................................................................24

       1. Kelley's Qualifications ....................................................................24

       2. Kelley's Comparators: The Buch Sisters........................................25

    C. The Court Erred in Concluding that Material Facts
Do Not Preclude Summary Judgment that Kelley's
Suspension and Termination was not Pretextual ...............................26

III. The Order Erred in Granting Summary Judgment as to Retaliation............28

IV. The Preclusion of the Gallagher Deposition was Error ...............................29

CONCLUSION.......................................................................................................32

CERTIFICATE OF COMPLIANCE......................................................................32

CERTIFICATE OF SERVICE ..............................................................................32

# TABLE OF CITATIONS

CASES

*Berry v. Crestwood Healthcare LP*,
    84 F.4th 1300 (11th Cir. 2023) .............................................................26, 27

*Faro Techs., Inc. v. Romer, Inc.*,
    2007 WL 496615 (M.D. Fla. Feb. 12, 2007) ................................................31

*Goldsmith v. Bagby Elevator Co., Inc.*,
    513 F.3d 1261 (11th Cir. 2008) ..............................................................22, 28

*Goldsmith v. City of Atmore*,
    996 F.2d 1155 (11th Cir. 1993) ........................................................................29

*Jenkins v. Nell*,
    26 F.4th 1243 (11th Cir. 2022) ........................................................................13

*Lewis v. City of Union City*,
    934 F.3d 1169 (11th Cir. 2019) ..............................................................19, 21

*Nunez v. Superior Oil Co.*,
    572 F.2d 1119 (5th Cir. 1978) ........................................................................25

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)......................................................... 15, 19, 24, 26, 27

*Muldrow v. City of St. Louis, Missouri*,
    601 U.S. 346 (2024) ........................................................................................16

*Raney v. Vinson Guard Serv., Inc.*,
    120 F.3d 1192 (11th Cir. 1997)........................................................................29

*Tynes v. Florida Dept. of Juvenile Justice*,
    88 F. 4th 939 (11th Cir. 2023)......................................................15, 19, 28

*Univ. of Tex. Sw. Med Ctr. v. Nassar*,
    570 U.S. 338 (2013) ........................................................................................13

## STATUTES

28 U.S.C. § 1291 ..................................................................................vi

28 U.S.C. § 1331 ..................................................................................vi

42 U.S.C. § 1981 ...................................................................... vi, 1, 2, 29

## RULES

Fed. R. Civ. P. 56 ...............................................iii, 1, 14, 15, 16, 18, 19, 20, 23, 27

Fed. R. App. P. 4 ..................................................................................vi

Fed. R. App. P. 32 ...............................................................................32

## PATTERN JURY INSTRUCTIONS

11th Cir. Pattern Jury Instr. 3.3 ..............................................................20

## STATEMENT OF JURISDICTION

The District Court had subject matter over this action because Appellant's claims arise under 42 U.S.C. § 1981. 28 U.S.C. § 1331. This Court has jurisdiction over this appeal from an order granting summary judgment. 28 U.S.C. § 1291. The District Court's summary judgment order was issued on October 22, 2024 (D.E. 74) and a notice of this appeal was timely filed on November 19, 2024. Fed. R. App. P. 4(a)(1)(A); D.E. 82.

## STATEMENT OF THE ISSUES

2.      Did the District Court err in granting summary judgment against Kelley on her claims for violations of 42 U.S.C. § 1981?

3.      Did the District Court fail to properly apply Rule 56 with respect to its analysis of factual and credibility disputes between the parties and its application of relevant law to the facts and disputes in this case?

4.      Could a jury infer intentional discrimination and/or retaliation from the record (including factual and credibility disputes)?

5.      Did the District Court err in drawing its own factual inferences against Kelley at the summary judgment stage that should be left to the jury?

6.      Did Kelley demonstrate a prima facie claim for discrimination and retaliation that precluded summary judgment?

7.      Did Kelley demonstrate a convincing mosaic of circumstantial evidence that would allow a jury to infer that she had been discriminated against?

8.      Did the District Court err in concluding that Kelley failed to identify an adequate similarly situated non-African American comparator.

9.      Did the District Court err by concluding that Allegiant's stated reason for terminating Kelley was not pretextual?

10.      Did the District Court err in concluding that no genuine disputes of material fact exist as the reason Kelley was terminated.

11.     Did the District Court err by failing to conclude that under the totality of the circumstances, circumstantial and/or direct evidence in the record precluded summary judgment as to Kelley's claims of discrimination and retaliation.

12.     Did the District Court err in refusing to consider "me too" evidence in connection with Appellant's claims for discrimination and retaliation

13.     Did the District Court err in precluding the deposition of Maurice Gallagher pursuant to the apex doctrine?

**STATEMENT OF THE CASE**[1]

**A. <u>Course of Proceedings and Disposition in the Court Below</u>**

On May 24, 2023, Ebony Kelley filed a filed a two-count lawsuit in the United States District Court for the Middle District of Florida against her former employer, Allegiant Air, LLC, for racial discrimination and retaliation in violation of 42 U.S.C. § 1981. D.E. 1 at p.6-7.

---

[1] Citations to the record are to the Document numbers generated by the District Court's electronic filing system the page(s) of each Document as follows: "**D.E. __ at __**." All cited Documents are contained in the Appendix to Appellant's Principal Brief, which will be filed in accordance with the Federal Rules of Appellate Procedure.

In accordance with 11th Cir. R. 28-5, deposition citations are to the page number that appears in the header generated by the District Court's electronic filing system, not the page numbers assigned by the court reporters.

On October 13, 2024, Kelley (who as explained had relocated to Arizona following her termination from Allegiant, D.E. 17 at 1) requested leave to attend her deposition remotely. *Id*. Her request was denied. D.E. 19.

On January 4, 2024, Kelley filed a motion to compel the deposition of Allegiant's CEO, Maurice Gallagher, explaining that Gallagher was a central witness to her claims as she was terminated immediately after she sent him an email complaining of racism at the Allegiant location where she worked. D.E. 24; D.E. 24-1-4. That motion was denied. D.E. 39 at 1-5.

Kelley was required to attend mediation in person in Tampa in January 2024. D.E. 21. Over Kelley's objection (D.E. 26), Allegiant's insurance carrier's representative was excused from attendance (D.E. 27) with Allegiant's lone justification being the assertion "there is no possibility, whatsoever, that [Allegiant] would approve any settlement that would require the insurance company to contribute any funds toward a potential settlement payment." D.E. 22 at 2, ¶6.

On January 29, 2024, Allegiant filed a Motion for Summary Judgment ("**Motion**"). D.E. 33. Kelley filed her opposition to the Motion on February 20, 2024 (D.E. 40) to which Allegiant filed a reply on March 5, 2024 (D.E. 42).

In the interim, on February 16, 2024, following Kelley's motion to compel (D.E. 25), Allegiant was ordered to produce certain documents relating to complaints of race discrimination at the Clearwater, Florida airport where Kelley worked. D.E.

39 at 10 ("[Allegiant] shall produce all documents discussing, referring to, mentioning, or reflecting its investigation into or response to complaints and reports by Allegiant agents or employees at PIE regarding racial discrimination and retaliation at PIE from January 1, 2020 through the present.").

On May 24, 2024, Allegiant produced the compelled documents (DEF 0337-0447), consisting of 140 pages involving numerous individuals relevant to Kelley's case (such as Kelley's direct supervisor, Allegiant's human resources agent who was involved with the relevant investigations and the decision to terminate Kelley, and Allegiant's CEO) and revealing rampant racism at Allegiant's Clearwater-PIE location. *See, e.g.*, D.E. 43-1 at 27-28 (Bates DEF0363-4). Allegiant unilaterally redacted the names of complaining employees, perpetrators, and witnesses. *See generally*, D.E. 43-1.

After Allegiant refused to produce the unredacted documents (D.E. 43-2), Kelley moved (a) to compel Allegiant to do so and (b) for the ability to file those documents as an addendum to her Response in Opposition to Summary Judgment on May 31, 2024. D.E. 43 at 5.

The following evening (a Saturday), the District Court entered an order granting Allegiant's Motion for Summary Judgment (Original D.E. 44) and an order denying Kelley's request for unredacted material and the ability to supplement the summary judgment record (Original D.E. 45).

On June 3, 2024 (the following Monday) the summary judgment order (Original D.E. 44), as well as the endorsed order denying D.E. 43 (Original D.E. 45) were removed from the public record and replaced with docket text "ENTERED IN ERROR per chambers." *See* Current D.E. 44 and Current D.E. 45.

The District Court then ordered Allegiant to produce the unredacted version of DEF 0337-0447 for *in camera* review. D.E. 50. The District Court then (a) placed DEF 0337-0447 under seal, (b) designated it "Attorneys Eyes Only" as it "contain[ed] privacy issues worthy of sealing[,]" (c) ordered the unredacted material be turned over to the Kelley's counsel, and (d) allowed for supplemental briefing from both parties pertaining to DEF 0337-0447's contents. D.E. 53.

In light of that order, Kelley's Surreply in Support of Her Opposition to Allegiant's Motion for Summary Judgment (D.E. 55-1) and the unredacted version of Bates DEF 0337-0447 (D.E. 55-2) were filed under seal with the District Court. Allegiant's Response to Kelley's Surreply (D.E. 59) was also filed under seal. *See, e.g.*, Order, attached hereto as Exhibit "E" (D.E. 58).

On October 22, 2024, the District Court entered an order granting Allegiant's summary judgment motion in full ("**Order**") (D.E. 74) and this appeal timely followed (D.E. 82).

**B. Statement of the Facts**

**1. Kelley Joins Allegiant-PIE**

On February 23, 2021, Allegiant hired Ebony Kelley, a black woman, was hired as a part-time, Trainee Customer Service Agent ("CSA") to work at the St-Pete Clearwater International Airport ("**PIE**"). D.E. 34 at 1, ¶1. Her direct report was General Manager Angela Peterson ("**Peterson**"). *Id*. On April 30, 2021, she became a part-time CSA. *Id*. at 2, ¶ 2. On April 1, 2022, Peterson approved Kelley's move to a full-time position. *Id*. at 7, ¶23.

**2. Racial Tensions at Allegiant-PIE.**

Acute racial tension was a strangely common occurrence at Allegiant-PIE. It is not normal for there to be concerns over a "race war" in the workplace. But that is what we have here. *See, e.g.,* 41-2 at p.18 at 69:6-70:11, 70:25-71:3; *see also* D.E. 43-1 at 28-30 (Allegiant-PIE employee Nov. 19, 2022 email to Allegiant COO Keny Wilper ("**Wilper**") describing racial tensions at Allegiant-PIE, including no one being suspended for use of 'n' word while employees are suspended for being late and stating "Having the agents ask me if there was a RACE WAR going on really hurt my heart[.]"); *see also* D.E. 36-13 (Peterson Dep.) at p.4 at 14:16-17 ("[T]here was a rumor going around that was escalating that there could be a race war.").

Similarly, in early November 2022, Allegiant Employee Relations Specialist-III Anna Mortimer ("**Mortimer**") was investigating the use of the terms 'spear

chuckers,' 'cotton pickers' and the "hard n word' at a karaoke night attended by various Allegiant PIE employees. D.E. 43-1 at 68-69; *see also* D.E. 41-4 at ¶ 3.

Kelley was not involved in that situation. But beginning in June 2021, coworkers made negative racial comments about Kelley's hair and started touching it. D.E. 41-2 at p.12 at 47:15-48:6 and p.90 at360:16-23. This was not a one-time occurrence. *See* D.E. 41-4 at ¶ 2. Kelley reported it to Peterson and other leads, and it occurred in front of numerous team leads. D.E. 41-2 at p.12-13 at 47:9-22, 50:6-12, 51:13-52:1 and at p.58 at 232:11-21. When first reported to Peterson, Kelley testified that Peterson stated that she too wanted to touch Kelley's hair. *Id*. at p.16 at 61:8-15. As Kelley would later explain, she also was the recipient of numerous discriminatory statements from co-worker Janelle Buch ("**J. Buch**"), the person who would go on to accuse Kelley of uttering a comment pertaining to race, which is the heart of Allegiant's defense.

By the time the situation between J. Buch and Kelley was being investigated, Mortimer, Wilper, and Allegiant's CEO Maurice "Maury" Gallagher ("**Gallagher**") were not only familiar with racial tensions at Allegiant-PIE, but in the case of Gallagher, had already intervened. *See* D.E. 43-1 at 28 (November 19, 2022 Allegiant employee email stating "Coming into work for the second time thinking someone is deliberately trying to sabotage me or directly being insubordinate with me because the color of my skin is absolutely unacceptable. The first time Maury

[Gallagher] and Ken [Wilper] assured me that [Allegiant] doesn't want anyone like that working at this company! . . . tell Maury [Gallagher] I still laugh because I thought those birthday emails were bogus until he responded and I told him what happened and action began immediately."). [2]

### 3. November 20, 2022 Incident and Subsequent Investigation

On November 20, 2022, something happened in a breakroom involving Kelley, J. Buch, and the use of a computer. J. Buch, nor any of the alleged witnesses interviewed by Allegiant, can agree on what Plaintiff allegedly said. *See, e.g.*, D.E. 40 at 11-12 (describing differing accounts of incident); D.E. 41 at ¶¶38-57. Kelley testified that she and J. Buch got into a disagreement while J. Buch was logged into, but not really using, a computer that Kelley needed to use to print out a report for work. D.E. 41-2 at p.52 at 207:20-24, p.53-54 at 212:8-5 and 213:6-10, p.64-65 at 256:6-19 and 257:8-23; D.E. 41-11 at 3-4. J. Buch refused to logout of the computer and told Kelley to use another. D.E. 41-2 at p.55 at 217:24-218:10, p.79 at 314:2-4. Kelley testified that J. Buch was angry with Kelley and "stormed out with an attitude." D.E. 41-2 at p.55 at 217:17-218:10.

Immediately after this incident, J. Buch reported the incident to Berrios (who, per Allegiant and J. Buch, was allegedly present during the incident) and Peterson.

---

[2] In July 2021, a co-worker complained that the sender of this email, who is black, was a "fucking n word [] telling me what to do." D.E. 43-1 at 4. That co-worker admitted to using the language and was terminated. *Id*. at 2-3.

D.E. 36-11 at p.6 at 23:7-24:6. Specifically, J. Buch claimed that Kelley had said either "is this racist?" or "that is racist" regarding J. Buch's unwillingness to give up the computer. D.E. 41-12 at 3. In subsequent interviews and written statements, J. Buch never became more specific. D.E. 41-6 at 3.

Alleged witnesses who provided interviews and written notes display a similar lack of specificity and troubling disparities. Alleged witness Kallista Stone at one point stated that "Kelley said something about is this because I'm black?" D.E. 41-9 at 3. She eventually claimed that Kelley said "Is it because of race?" D.E. 41-7 at 2. Meanwhile, Carlos Huertas said that "Really [I] do not recall specifically what was said . . . heard some racial that was not fair." D.E. 41-11.  He later said "If I recall right a racial comment was made" by Kelley. D.E. 41-11 at 2.  Reinaldo Berrios wrote that Kelley allegedly said "this is racist because she is white." D.E. 41-10 at 2.  At another point he stated that Kelley asked "what is it because you're white[?] D.E. 41-10 at 3. In other words, there are at least 5 varying versions of what was allegedly said. Allegiant never questioned these witnesses as to why their own accounts varied or why they were inconsistent with one another. D.E. 41-3 at p.10-11 at 38:3-41:10. At least one alleged witness identified by J. Buch (Michael "Ace") was never interviewed for unknown reasons. D.E. 41-12 at 3. Allegiant, as a matter of policy, does not record witness interviews and it is impossible to know the nature of the questioning (e.g., leading or coercive). D.E. 41:3 at p.7 at 26:17-27:9; *see also*

*id*. at 27:2-19 (describing the inherently subjective nature of writing interview notes).

Kelley has always maintained that she never said anything about race during the breakroom incident, from her first interview regarding the subject on December 12, 2022 through her deposition. *See, e.g.*, D.E. 41-2 at p.55 at 217:24-218:10, p.79 at 314:2-4; D.E. 41-9; D.E. 41-11 at 3-5. She further testified that neither Berrios nor Stone were present when J. Buch became angry and left the breakroom. D.E. 41-2 at p.62 at 248:4-13, p.64 at 256:6-14, p.75 at 298:20-299:9. During her December 12, 2022 interview, she was clear that nothing was discussed about race *on November 20, 2022*. D.E. 41-11 at 5 (attributing to Kelley statement that "racism didn't come up *that night*.") (emphasis added).

### 4. Kelley Provides a Written Account of Workplace Racism and is Suspended four days later.

In accordance with Mortimer's request, Kelly provided a written account of the incident on December 15, 2022 D.E. 36-14 at ¶ 26 and p.25-26 (DEF 0037-38). Therein, Kelley detailed a litany of specific instances in which J. Buch had made inappropriate racial statements to her in the months before the November 20, 2022 breakroom incident and stated she had more examples. *Id*. at p.25-26. Kelley specially pointed out that J. Buch's brother, an Allegiant-PIE employee at the time, joined in on at least one occasion. *Id*. Kelley told J. Buch that such comments were out of line, and gradually tried to avoid her. She also stated that she had been told by

a co-worker that he overheard J. Buch and Samantha Buch ("**S. Buch**"), who is J. Buch's sister, standing with a third person stating their intention to get "this nigger bitch fired" in reference to Kelley. *Id*. No separate case file was opened into Kelley's complaints. D.E. 41-3 at p.12 at 47:14-25.

There is no indication that S. Buch or J. Buch's brother were ever interviewed regarding these accusations. This is despite Allegiant's alleged policy of interviewing all witnesses. *See, e.g.*, D.E. 41-3 at p.6 at 22:18-24 and 24:11-13, p.12 at 46:6-48:4, p.14-15 at 56:23-57:21 ("It's appropriate to identify witnesses and their contribution to the case."); D.E. 36-13 at p.4 at 13:1-14:1. This is also despite the fact that S. Buch was at the karaoke-bar described *supra* and that Allegiant was aware she had been accused of using racial epithets. D.E. 41-4 at ¶ 3. What is known is that J. Buch was never asked about the "nigger bitch" allegation when questioned on December 22, 2022. D.E. 41-6 at 4-5. On allegations she was questioned about, J. Buch simply turned the blame back upon Kelley. Mortimer also testified that she had conversations regarding the investigation that were not memorialized. D.E. 41-3 at p.12 at 45:17-46:8.

But before that December 22, 2022 interview of J. Buch occurred, Kelley was placed on suspension following a December 19, 2022 interview where she maintained her story. And so, she tried to take matters into her own hands.

**5. Kelley Emails Gallagher on December 19, 2022 and is Terminated In Retaliation**

On December 19, 2022, after being placed on suspension, Kelley emailed CEO Gallagher. D.E. 51-8 at 2-3. She described the racial tensions at Allegiant-PIE, how any concerns were brushed under the rug, how she had recently addressed a co-worker about racist comments and was then placed on suspension pending investigation. *Id*. This is all true. At no point did she say that she mentioned race on November 20, 2022. *Id*. Gallagher (at a minimum) passed the email down the line where it reached Mortimer, who on December 20, 2022 stated that in "both investigative meetings and her written statement she denied saying anything related to racism to the employee in the situation because there was nothing racist that occurred." *Id*. at 2. This is unequivocally false in light of Kelley's December 15, 2022 written report. D.E. 36-14 at p.25-26. Mortimer concluded: "There is a dishonesty issue with this employee." *Id*. Mortimer ignored Kelley's December 15, 2022 write-up and had yet to even question J. Buch about its contents when she reached these conclusions. And, as Mortimer testified, prior to the Gallagher email, there were no allegations of dishonesty related to Kelley. D.E. 41-3 at p.11 at 44:20-25.

On December 27, 2022, Mortimer circulated an email recommending Kelley's termination. D.E. 41-5 at 2. Mortimer specifically pointed out that Kelley brought her concerns regarding workplace racism to Gallagher. *Id*. Mortimer then claimed

that Plaintiff "claimed she addressed J. Buch 'two months ago' but was unable to provide additional details. [Kelley's] narrative vacillated and she did not provide much detail regarding her allegations of racism in PIE, other than her concerns that coworkers had touched her hair and that was addressed and has since stopped." *Id*. However, twelve days before, Plaintiff supplied a significant list of workplace racism that went well beyond her hair and identified witnesses to some of that conduct. Kelley was formally terminated on December 28, 2022 for 'misconduct.'

Kelley's life was upended after her termination. She was forced to move to Arizona as it had a shorter wait time for her to gain access to assisted housing. D.E. 41-2 at p.8 at 29:21-30:15. Through the stress of moving as a result of losing her job, she lost the child she was carrying *Id*. at p.97 at 385:6-19.

### C. <u>Standard of Review</u>

This Court reviews *de novo* the District Court's grant of summary judgment, viewing all evidence and drawing all reasonable factual inferences in favor the nonmoving party. *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (citing *Lewis v. City of Union City,* 934 F.3d 1169, 1179 (11th Cir. 2019) (*Lewis II*).

## <u>SUMMARY OF THE ARGUMENT</u>

The Order concludes with the following:

[Kelley] has failed **to prove** that Allegiant's desire to retaliate was the "but-for" cause of her suspension and termination. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 360 (2013). The Court

> concludes that there are no genuine disputes of material fact precluding summary judgment on retaliation.

D.E. 74 at 39. This short statement lays bare the problem that is just under the surface of the entirety of the Order. It was not Kelley's burden to prove her case at the summary judgment stage. It was her burden to present genuine factual disputes from which a jury could infer that she was intentionally discriminated and retaliated against. She did that. But the District Court failed to properly apply Rule 56. Kelley's federal employment discrimination claims are not subjected to any heightened standard. Rule 56 is the polestar.

Allegiant's human resources officer suspended Kelley prior to investigating any of her detailed allegations of racial misconduct. That same human resources officer then accused Kelley of dishonesty within 24 hours of Kelley sending an email describing her situation to Allegiant's CEO, and used the email to the CEO as a baseline for recommending her termination. Kelley was fired within nine days of sending the email.

The District Court granted summary judgment once, only to remove it from the docket and reopen briefing upon Allegiant's production of 140-pages of material that had been improperly withheld until summary judgment briefing was closed. Allegiant refused to produce a material witness with direct knowledge of both Kelley's claims and the racial rancor that had engulfed Allegiant-PIE, knowledge that Allegiant knew would be revealed in those 140 pages.

And yet, the District Court sided with Allegiant's narrative and resolved inferences and made credibility determinations in Allegiant's favor. Summary judgment was granted, again.

A convincing mosaic of circumstantial evidence is not a set of boxes to check. *McDonnell Douglas* is not meant to be stretched to the outer bounds of reason. On this record, Rule 56 precluded the District Court from answering the ultimate of whether or not Allegiant discriminated against Kelley on the basis of her race. But it did. In so doing, the District Court improperly invaded the purview of the jury and should be reversed.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I. The District Court Did Not Apply Rule 56

The District Court did not apply Rule 56. That was in error. Over the past thirty years, federal courts have created a variety of tests and burdens that apply almost exclusively in employment discrimination cases. This problem is particularly acute in the South, where defeating summary judgment in an employment discrimination case is now considered a Herculean task. But that is not the actual law. Rule 56 governs all federal civil cases. There is no exception for employment discrimination cases. *See Tynes v. Florida Dept. of Juvenile Justice*, 88 F. 4th 939, 947 (11th Cir. 2023) (discussing the convincing mosaic and explicitly stating that summary judgement works the same way in employment discrimination cases as it

does in all other cases). The text of Rule 56 provides that summary judgment is only appropriate when there is "no genuine dispute as to any material fact."

The District Court did not apply that standard. It did not ask if there were material facts in dispute. Instead, the District Court decided the case. There are two places in the District Court's summary judgment ruling that make this clear. First, the District Court's conclusion: "Plaintiff has failed to **prove** that Allegiant's desire to retaliate was the 'but for' cause of her suspension and termination." D.E. 74 at 38 (emphasis added). At the summary judgment stage, Kelley was not required to prove anything. Instead, she was only required to present a genuine dispute over material facts. In requiring Kelley to prove her case, the District Court improperly recalibrated the applicable burdens. The burden was supposed to be on Allegiant, not Kelley. Beyond this: A claim for race discrimination can exist where race was the but for cause of "some harm," even if that harm did not rise to the level of suspension or termination. *See, e.g., Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024). Although *Muldrow* was a Title VII case, that logic still applies here.

Second, the District Court repeatedly concludes that Allegiant's position was "reasonable." *See, e.g.*, D.E. 74 at 26 (stating that "Mortier's assessment" of Kelley's email to Gallagher, i.e., that is, that Kelley was lying "appears reasonable."). Once again, Rule 56 does not permit courts to grant summary judgment where they find the defendant's position reasonable. Rule 56 is about absolutes and certainty, not

reasonableness. In this context, a grant of summary judgment predicated on the District Court's concept of reasonableness usurps the role of the jury. That is particularly so when there are disputed inferences and credibility is at issue. Here, the District Court credited Allegiant's version of events and resolved all inferences in favor of Allegiant. That is improper. *See Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978) (calling summary judgment a "lethal weapon" susceptible to "overkill" and admonishing that inferences and credibility determinations go to the jury).

Not only that, but the District Court repeatedly ignores one of Kelley's central contentions: Kelley has consistently testified that she did not call J. Buch a racist or accuse her of racism in the break room *on November 20, 2022*. Kelley told Allegiant that she did not call J. Buch a racist in the break room *that day*. But Kelley also testified that she *previously* complained about J. Buch's racist behavior and racial harassment – just not in the break room *that day*. Allegiant conflated all of this to create the following narrative: Kelley said she did not call J. Buch a racist. But then Kelley said she did call out J. Buch's racism. So, Kelley is a liar. That is not sound logic and is not supported by the record. But the District Court embraced that narrative as reasonable and dispositive. Also, the District Court completely ignores Allegiant's failure to properly investigate Kelley's allegations against J. Buch, who is white.

The District Court's wholesale embrace of Allegiant's narrative is even more perplexing given issues pertaining to Gallagher. In resisting Kelley's attempt to depose Gallagher, Allegiant represented that Gallagher had no personal knowledge or involvement in this matter. Beyond the email from Kelley and his conduct with it, the documents Allegiant produced late in the litigation showed that Gallagher was personally and contemporaneously involved with the ongoing race problem at Allegiant-PIE. Even after that subterfuge, the District Court still credits Allegiant as the party telling the truth. Again, that is improper and not in accordance with Rule 56 and binding appellate case law.

Not only are the facts here disputed, but so too are inferences and credibility determinations. A jury reasonably could conclude that Kelley was treated differently on account of her race, retaliated against for complaining about racism, and ultimately fired because of her race or because she reported racism. In other words: If Kelley was white, we would not be here. The District Court's adoption of Allegiant's version of events, embrace of every argument Allegiant raised, resolution of all credibility determinations in Allegiant's favor, and drawing of all inferences in Allegiant's favor is fundamentally inconsistent with Rule 56. On this basis alone, the District Court's decision should be vacated.

## II. __Kelley Proffered Sufficient Circumstantial Evidence to Survive Summary Judgment__

Allegiant intentionally misconstrued and failed to act on facts known to it when investigating the underlying workplace dispute and Kelley's allegations of workplace racism. All of this occurred at a workplace that was a known hotbed of racial tension and strife. Genuine disputes preclude a determination that Kelley lost her job for anything other than her complaints about what Allegiant and its CEO already knew: That Allegiant-PIE has a race problem and that she was not being subjected to a fair investigative process. Whether travelling under the convincing mosaic standard or that of *McDonnell Douglas*, Kelley's claims survive Rule 56.

### A. Convincing Mosaic

The convincing mosaic approach may look to, "among other things . . . "suspicious timing, ambiguous statements . . . and other bits and pieces from which an inference of discriminatory intent might be drawn" and "evidence that the employer's justification is pretextual." *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quotation omitted); *see also Tynes*, 88 F.4th at 947 ("[W]e look beyond the prima facie case to consider all relevant evidence in the record to decide the ultimate question of intentional discrimination."). It is simply an analysis of whether circumstantial evidence is present that "would allow a jury to infer intentional discrimination*." Lewis*, 934 F.3d at 1185 (quotation omitted). The language prefacing the three enumerated categories of *Lewis* ("among other things")

and the catch-all in the first enumerated category ("… and other bits and pieces from which an inference of discriminatory intent might be drawn") make this crystal clear. 934 F.3d at 1185.

And yet, with growing frequency, the 'convincing mosaic' framework is being rejiggered as a three-pronged test requiring a showing of (1) suspicious timing and ambiguous statements, (2) systematically better treatment of similarly situated employee and (3) pretext. To take a rigid approach is to ignore fundamental tenets of demonstrating circumstantial evidence and impermissibly expand Rule 56. *See, e.g.,* 11th Cir. Pattern Jury Instr. 3.3 ("'Circumstantial evidence' is proof of a chain of facts and circumstances that tend to prove or disprove a fact.). The Order takes the aforementioned 'three-pronged approach,' causing it to run afoul of Rule 56. The facts above lay out a circumstantial tapestry that a reasonable jury could conclude exhibits intentional racial discrimination.

Taking all reasonable inferences in Kelley's favor, the District Court erred by failing to determine that she articulated a sufficient mosaic of circumstantial evidence to proceed to trial. We now turn to the specifics of the three enumerated mosaic prongs addressed in the Order.

1. Suspicious Timing and Ambiguous Statements and Other Information

The Order fails to account for the fact that upon seeing the Gallagher email, Mortimer called into question Kelley's honesty and ignored the fact that Kelley had

already provided her with a written statement that (a) articulated specific instances of racism she had encountered with J. Buch (and her brother and sister) in the months leading up to November 20, 2022 and (b) maintained her position that she had not brought up race on November 20, 2022. D.E. 74 at 26. Mortimer made this statement prior to questioning J. Buch (and never questioned S. Buch) about Kelley's allegations.

The Order also impermissibly found that no reasonable jury could conclude that Kelley was telling the truth despite the inconsistent statements provided by the alleged witnesses to the November 20, 2022 incident. This conclusion was reached despite the fact that Allegiant failed to question witnesses regarding inconsistencies in their statements and when reviewed against one another, not recording the interviews, and not questioning all people who J. Buch claimed witnessed the incident.

Within eight days of emailing Kelley's email to Gallagher, Mortimer recommended Kelley be terminated, and pointed again to the Gallagher email as a predicate. A reasonable jury could conclude that the timing of Mortimer's questioning of Kelley's honesty and termination was a direct result of Kelley bringing attention to her plight.

## 2. 'Me Too' Evidence and Systematic Better Treatment of Similarly Situated Employees

The Order categorizes evidence of rampant misconduct at Allegiant-PIE as "me too" evidence that does not move the needle as to whether there was systematic better treatment of similarly situated employees. It also contends that such evidence has no bearing on Kelley's claims because she lacks a 'pattern and practice claim.' First of all, if this type of evidence only is admissible in pattern and practice claims, then it necessarily is not a requisite component of convincing mosaic of circumstantial evidence in all claims.

Either way, this type of evidence is admissible in this case. Evidence of the rampant racial issues at Allegiant PIE tends to show that there was systematic better treatment of non-blacks. But more importantly, it goes to the knowledge and credibility of all the relevant Allegiant players. They knew what was going on at Allegiant-PIE. And despite that knowledge, Allegiant failed to adequately investigate Kelley's allegations and gave credence to J. Buch's vague version of events. The Order's reliance on *Goldsmith v. Bagby Elevator Co.* (D.E. 74 at p. 30, n. 16) on this issue is misplaced. 513 F. 3d 1261 (11th Cir. 2008). First, that case, like others relied on by the Order, did not arise from summary judgment, but followed a trial. Second, the *Goldsmith* Court allowed 'me too' testimony in *despite* the fact that it failed to satisfy Rule 406 because, among other things, the evidence went to the defendant's intent.

With respect to ignoring pervasive comments regarding a 'race war,' Kelley and Peterson both testified that they had heard of it. Peterson tried to pin it on a supervisor named Alysha Dixon who herself had brought it to the attention of management upon hearing about it from employees. D.E. 36-13 at p.4 at 14:13-15:13. Other employees claimed that they heard about the race war from Kelley herself. The notion that it is inadmissible hearsay that could never be reduced to an admissible form at trial is simply not accurate. Nor is it improper character evidence.

The Order also suggests that a specific complaint about employees going unpunished for using racial slurs at a bar with co-workers is irrelevant because the complainant was not African-American. That interpretation does not square with Rule 56 or evidentiary principles. This event (and others) were going on during a time of heightened racial tensions at Allegiant-PIE. There are emails directed to Mortimer and referencing Gallagher and Wilper about these things the day before the breakroom incident that began this case. The way these things were handled matters. And they also directly flow into the way that Kelley's subsequent allegations were handled by Allegiant. For example, Allegiant knew that S. Buch was present at the bar where slurs were used. This raises further questions as to why she was never interviewed in connection with *Kelley's* complaint. Multiple people implicated denied that anything happened, and that was that. No one was reprimanded for their version of events.

This also helps explain why Kelley chose not to press the issues detailed in her December 15, 2022 written statement prior to being told to submit it: Kelley testified that she avoided bringing up concerns about racism with management because she had seen use of the n-word reported and nothing happen to the person making the statement, while the person who reported the misconduct was "shunned." D.E. 41-2 at p.57-58 at 228:1-229:16. Finally, if the complaining person, a white co-worker, had fabricated the allegations of racial slurs, why was she not suspended and terminated for 'dishonesty'? These are all questions for a jury to consider when analyzing Kelley's claims against Allegiant and cut against the grant of summary judgment.

### B. *McDonnell Douglas*

 The District Court states that Kelley fails *McDonnell Douglas* because she was (a) no longer a qualified employee and (b) lacks an adequate comparator. Neither of these conclusions are supported by undisputed facts.

#### 1. Kelley's Qualifications

The District Court concluded that Kelley was no longer qualified due to violations of policies regarding (a) attendance and (b) "truthfulness and openness during the investigation." D.E. 74 at 23. Attendance had nothing to do with Kelley's termination and reliance upon it as a basis for her firing is yet another instance of the District Court simply taking Allegiant's word for it. Kelley's formal termination was

categorized as 'misconduct,' an amorphous term designed to protect Allegiant from what it had done. There was no mention of attendance. Second, the District Court again gives credence to Allegiant's 'belief' that Kelley had been dishonest. Existing genuine disputes of material fact on that subject are outlined elsewhere.

## 2. Kelley's Comparators: The Buch Sisters

Kelley put forward the Buch sisters, who are white. The Order recognizes that Kelley and the Buch sisters were all three CSAs during the relevant timeframe. D.E. 74 at 24. It then contorts the meaning of 'comparator' to require the sisters to have (1) used a racist term or accused a co-worker of racist intentions, (2) be found dishonest. This is analytically incorrect.

Point one of this analysis presupposes that Kelley did say some amorphous version of "because I'm black" or "because you're white" or "this is racist" or "is this racist?" That remains genuinely disputed. It also ignores that Kelley has alleged that J. Buch of, at a minimum using "racist terms." *See, e.g.*, 41-2 at p.57 at 227:2-9 ("Q. And you said that Jenelle made a joke about black people and chainsaws, correct? A. She did. Q. Okay. What did she say? A. She asked me why black people are afraid of chainsaws Q. And what did you say? A. I don't know. Q. And what did she say? A. Because it says nigger, nigger, nigger, nigger, nigger."). S. Buch was similarly—albeit less directly— implicated in Kelley's December 15, 2022 written statement.

But beyond that, it cannot be that in this context a peer must be found dishonest to be an apt comparator. Kelley is claiming that Mortimer's conclusion regarding her dishonesty was a sham and that her complaints were not investigated in a manner similar to the investigation into her. This includes Allegiant taking J. Buch's denials at face value, the failure to seek corroborating evidence, or interview S. Buch.

The Buch sisters are apt comparators because they are two similarly situated white women who were not subjected to the investigation that Kelley was. There is no dispute that neither sister was ever punished for anything related to Kelley's complaints. Nor is it disputed that Allegiant failed to reach a formal conclusion regarding Kelley's allegations. And how could it have, because neither Buch sister was investigated like their similarly situated black peer.

### C. The Court Erred in Concluding that Material Facts Do Not Preclude Summary Judgment that Kelley's Suspension and Termination was not Pretextual

Pretext's inclusion as an enumerated category with respect to the convincing mosaic standard, and the fact that rebuttal of a legitimate, nondiscriminatory termination reason is a requisite for a plaintiff to survive summary judgment under *McDonnell Douglas* causes conflation between the two theories. But a convincing mosaic theory may be successfully advanced with or without a showing of pretext. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1313 (11th Cir. 2023) ("pretext

may, but need not always, be part of the employee's evidence when an employee attempts to prove retaliation without the *McDonnell Douglas* framework").This makes sense as the law that has sprung up around pretext at the summary judgment stage in the *McDonnell Douglas* context is predicated on a burden shifting that is not in line with Rule 56.

In other words, if a court applies a rigid (and improper) convincing mosaic analysis of pretext it can be viewed as a critical component for a non-movant employee to survive summary judgment in a discrimination case. *See, e.g.,* D.E. 74 at 32 (analyzing pretext in context of convincing mosaic framework). Here, whether analyzed as a component of Kelley's body of circumstantial evidence or an argument requiring her rebuttal under *McDonnell Douglas*, the District Court's conclusion that summary judgment was warranted in favor of Allegiant on the question of pretext was incorrect.

The Order states that is not enough for Kelley to "simply argue that the [alleged reason for her termination] was not true or that she did not believe her conduct amounted to dishonesty." D.E. 74 at 32. That is a true statement. But that is not what Kelley did. She has faced the proffered reason head on. She has pointed out the discrepancies between the investigation into her allegations and that of others. She pointed out that the circumstances surrounding both her suspension and

termination are intertwined with reporting racism at Allegiant-PIE. Genuine disputes of fact precluded the District Court's finding that her termination was not pretextual.

Of course, a business has discretion to exercise its judgment. But that discretion has its limits. To begin with, Allegiant has no policy for ferreting out dishonesty. Such determinations are inherently subjective, turning on "the facts in the case." D.E. 41-3 at p.9 at 34:20-22; *see also id*. at p.7 at 27:2-19 (describing how interview notes are taken "for our own point of reference as best we can"). And the record indicates that sometimes Allegiant's 'policies' matter and sometimes they do not. Yet the District Court appears to create an Allegiant policy of "truthfulness and openness during" investigations. Even if Allegiant's supposed policies *could* have warranted Kelley's termination, that is a question that the jury may weigh. *See, e.g.*, *Tynes*, 88 F 4th at 942 (upholding denial of judgment as matter of law despite "laundry list" of reasons for termination proffered by defendant).

### III. <u>The Order Erred in Granting Summary Judgment as to Retaliation</u>

Kelley's ultimate burden at trial is to prove that she engaged in statutorily protected activity, suffered an adverse action, and there was some causal relation between the two events. *Goldsmith*, 513 F.3d at 1277 (citation omitted). Kelley maintains that she told the truth during the investigative process and told the truth in her email to Gallagher.

To satisfy the "causal link" prong of a *prima facie* retaliation case, a plaintiff must generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action. *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993). A corporate defendant acts through authorized agents, in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of her agency when taking the action. *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir. 1997). There is no dispute that Kelley was suspended after she submitted her December 15, 2022  report. There is also no dispute that at the time Mortimer began calling Kelley's honesty into question, she was well aware of Kelley's allegations and continued complaints.  Both of these things, which are intertwined with Mortimer's knowledge and conduct, create triable issues as to Kelley's retaliation claim. A reasonable jury could infer that Kelley's suspension and termination were the result of Kelley reporting of discriminatory conduct. In other words, that she was retaliated against in violation of § 1981.

### IV.  <u>The Preclusion of the Gallagher Deposition was Error</u>

During the litigation, Kelley sought to take the deposition of Allegiant's CEO, Gallagher. The Court denied Kelley's Motion to Compel that deposition under the Apex Doctrine. D.E. 39. The Court's holding was in error. The purpose of the Apex

Doctrine is clear: To prevent litigants from using depositions to harass high-ranking corporate executives who have no knowledge that is relevant or that could lead to relevant evidence. That makes sense. Litigants should not be permitted to use depositions to harass corporate executives who were not involved in the situation or have no pertinent information. But that logic does not apply here.

On December 19, 2023, Kelley emailed Gallagher, explained the situation to him, and asked for his help. On December 27, 2022, Mortimer made the recommendation to fire Kelley. And on December 28, 2022, Allegiant fired Kelley. When Plaintiff sought to take Gallagher's deposition during the litigation, Allegiant maintained that Gallagher had no relevant knowledge and that any such deposition was barred by the Apex Doctrine. But neither Allegiant nor Gallagher ever disavowed Gallagher's knowledge under penalty of perjury. Because Gallagher knows something.

The Court's underlying Order denying Plaintiff's Motion to Compel the Gallagher deposition (D.E. 39) was based on the logic that Gallagher had no unique knowledge of the matter because all he did was forward an email that he received from Kelley. The undersigned understands and respects that. But we submit that the email to Gallagher, Kelley's immediate firing, the fact that Kelley took depositions of 3 other Allegiant folks (including the manager at Clearwater and the relevant HR

person), and Gallagher's failure to submit a sworn statement disavowing knowledge all weighed in favor of allowing the deposition.

Regardless, that notion above (i.e., Gallagher had no knowledge) has since been disproven. Consider some of the cases that the Court cites in the relevant Order. *See, e.g., Faro Techs., Inc. v. Romer, Inc.,* 2007 WL 496615, at \*4 (M.D. Fla. Feb. 12, 2007) ("It may be appropriate to enter orders limiting depositions of senior management and other high level decisionmakers who are removed from the daily subjects of litigation."). The Court cites that exact quoted language. That is a sound point of law. But Gallagher was not removed from the subject of the litigation. He was in the thick of it. Not only that, but Allegiant's representation that Gallagher had no involvement does not square with the late-produced documents. D.E. 43-1 at 28. At this stage, the record makes clear that Gallagher was personally and contemporaneously in talks with Allegiant employees at Clearwater about racism. That is enough to justify Kelley taking his deposition. If this Court reverses and remands the case for further proceedings, Kelley requests that this Court permit her to depose Gallagher before trial.

## CONCLUSION

Kelley respectfully requests that this Court reverse the Order granting summary judgment and allow her to take the deposition of Gallagher prior to trial.

By: */s/ Christopher S. Prater*
**CHRISTOPHER S. PRATER**
cprater@pollardllc.com
Florida Bar No.: 105488

**POLLARD PLLC**
401 E. Las Olas Blvd. Ste. 1400
Fort Lauderdale, FL 33301
Telephone: 954-332-2380
*Attorneys for Appellant Ebony Kelley*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limit set forth Fed R. App. P. 32(a)(7)(B)(i) in that it contains 7323 words. Fed. R. App. P. 32(g)(1).

By: s/ *Christopher S. Prater*
Christopher S. Prater

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 30, 2025, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system.

By: s/ *Christopher S. Prater*
Christopher S. Prater