---

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**EBONY KELLEY,**
*Appellant,*

**v.**

**ALLEGIANT AIR, LLC,**

*Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION
CASE NO.: 8:23-cv-01162-WFJ-SPF
JUDGE WILLIAM F. JUNG PRESIDING

---

**APPELLEE'S ANSWER BRIEF TO APPELLANT'S PRINCIPAL BRIEF**

---

Dawn Siler-Nixon
Florida Bar No. 993360
Email: dsiler-nixon@fordharrison.com

Viktoryia Johnson
Florida Bar No. 0125545
Email: vjohnson@fordharrison.com

FORDHARRISON, LLP
401 E. Jackson St., Suite 2500
Tampa, FL 33602
813-281-7800 Telephone
*Attorneys for Appellee*

_____

**UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

_____

**EBONY KELLEY,**

*Appellant*,

**V.**

**ALLEGIANT AIR, LLC,**

*Appellee*.

_____

**APPELLEE'S CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Appellee, Allegiant Air, LLC ("Allegiant"), hereby files the following Certificate of Interested Persons and Corporate Disclosure Statement, pursuant to 11th Cir. R. 26.1.

1.      The name of the trial judge, and all attorneys, persons, association of persons, firms, partnerships, or corporations that has or may have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, including any publicly held corporation that owns 10% or more of a party's stock, and all other identifiable legal entities related to a party:

Allegiant Air, LLC, Appellee

Boehringer, Michael, Esq.

Flynn, Sean, U.S. Magistrate Judge for the Middle District of Florida

FordHarrison LLP

Johnson, Viktoryia, Esq.

Jung, William, U.S. District Judge for the Middle District of Florida

Kelley, Ebony, Appellant

Prater, Christopher, Esq.

Pollard, Jonathan, Esq.

Pollard, PLLC

Siler-Nixon, Dawn, Esq.

2.     Appellee is not aware of any other entity whose publicly-traded stock, equity, or debt may be substantially affected by the outcome of the proceedings.

3.     Appellee is not aware of any other entity likely to be an active participant in the proceedings.

## STATEMENT REGARDING ORAL ARGUMENT

Allegiant does not believe oral argument to be necessary in this case. The case does not involve unique issues of law. The District Court properly granted Allegiant's Motion for Summary Judgment based upon clearly established Eleventh Circuit precedent. The District Court's opinion is clear and well-reasoned, and all parties have had a fair and full opportunity to address all issues via written briefing. Thus, oral argument will not assist the Court in deciding the issues in this case.

# TABLE OF CONTENTS

APPELLEE'S CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ................................. ii

STATEMENT REGARDING ORAL ARGUMENT ...........................iv

TABLE OF CONTENTS .............................................................v

TABLE OF AUTHORITIES .................................................. vii

STATEMENT OF JURISDICTION............................................1

STATEMENT OF THE ISSUES................................................1

STATEMENT OF THE CASE....................................................1

   I. PROCEDURAL HISTORY ............................................... 1

   II. STATEMENT OF FACTS ............................................... 4

     A.   Kelley's Employment at Allegiant ...............................4

     B.   Kelley Complains About a Coworker Touching Her Hair ...........4

     C.   Kelley Calls a White Coworker a "Racist"........................6

     D.   Allegiant Investigates J. Buch's and Kelley's Competing
        Allegations........................................................6

     E.   Allegiant Terminates Kelley for Dishonesty During an
        Internal Investigation...........................................13

     F.   Unrelated Complaints Against Other Individuals at
        Allegiant ........................................................14

SUMMARY OF THE ARGUMENT ....................................15

LEGAL ARGUMENT..........................................................17

   I. STANDARD OF REVIEW ............................................... 17

   II. THE DISTRICT COURT CORRECTLY APPLIED FED. R.
      CIV. P. 56 TO FIND THAT APPELLANT HAD NOT CREATED
      ANY GENUINE ISSUES OF MATERIAL FACT FOR TRIAL ............ 18

     A.   Kelley Misunderstands the Summary Judgment Burdens ..........18

     B.   The District Court Appropriately Held That Mortimer's
        Investigation and Conclusions Were "Reasonable" .................24

C.      The Key Issue Is Whether Allegiant's Belief Was Made in Good Faith..............................................................................27

D.      CEO Gallagher's Participation, in Some Way, in Remedying Another Employee's Unrelated Complaint Does Not Support a Reversal of Summary Judgment ...........................30

III. APPELLANT DID NOT OFFER SUFFICIENT CIRCUMSTANTIAL EVIDENCE OF RACE DISCRIMINATION TO SURVIVE SUMMARY JUDGMENT ............ 31

A.      Kelley Has Not Created a Convincing Mosaic of Discrimination by Suspicious Timing, Ambiguous Statements, or Otherwise.....................................................31

B.      Kelley Has Not Created a Convincing Mosaic of Discrimination with Her Alleged "Me Too" Evidence .................36

IV. THE DISTRICT COURT DID NOT ERR IN FINDING THAT APPELLANT DID NOT OFFER PROPER COMPARATORS............. 40

V. THE DISTRICT COURT DID NOT ERR IN FINDING THAT KELLEY COULD NOT SHOW PRETEXT.................................................... 43

VI. THE DISTRICT COURT DID NOT ERR IN HOLDING APPELLANT HAD FAILED TO CREATE GENUINE ISSUES OF MATERIAL FACT WITH RESPECT TO HER CLAIM FOR RETALIATION ................................................................................... 46

VII. THE DISTRICT COURT'S ORDER DENYING APPELLANT'S MOTION TO COMPEL CEO GALLAGHER'S "APEX" DEPOSITION IS NOT PROPERLY BEFORE THIS COURT.............................................................................................. 48

# TABLE OF AUTHORITIES

PAGE(S)

Cases

*Alvarez v. Royal A. Developers, Inc.*,
    610 F.3d 1253 (11th Cir. 2010) .................................................. 21, 46
*Butler v. Ala. Dept. of Transp.*,
    536 F.3d 1209 (11th Cir. 2008) ........................................................20
*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................... 17, 19
*Chandler v. Sheriff, Walton Cnty.*,
    No. 22-13698, 2023 WL 7297918 (11th Cir. Nov. 6, 2023)................38
*Chick-Fil-A, Inc. v. CFT Dev., LLC*,
    No. 5:07-CV-501-OC-10GRJ, 2009 WL 928226 (M.D. Fla. Apr. 3, 2009)........50
*Chukes v. Sailormen Inc.*,
    648 F. App'x 779 (11th Cir. Apr. 15, 2016) .......................................45
*Clark Cnty. Sch. Dist. v. Breeden*,
    532 U.S. 268 (2001) ............................................................... 36, 47
*Commonwealth Land Title Ins. Co.*,
    No. 22-12264, 2023 WL 6866620 (11th Cir. Oct. 18, 2023)..............17
*Davis v. Dunn Construction Co.*,
    872 F. Supp. 2d 1291 (N.D. Ala. 2012) .............................................38
*Doe v. Drummond Co.*,
    782 F.3d 576 (11th Cir. 2015) ...........................................................19
*E.E.O.C. v. Total Sys. Servs., Inc.*,
    221 F.3d 1171 (11th Cir. 2000) .................................................. 29, 34
*Elrod v. Sears, Roebuck & Co.*,
    939 F.2d 1466 (11th Cir. 1991) .................................................. 29, 34
*Fitzpatrick v. City of Atlanta*,
    2 F.3d 1112 (11th Cir. 1993) ...................................................... 18, 19
*Flournoy v. CML-GA WB, LLC*,
    851 F.3d 1335 (11th Cir. 2017) ........................................................20
*Goldsmith v. Bagby Elevator, Inc.*,
    513 F.3d 1261 (11th Cir. 2008) ........................................................38
*Graham v. Best Buy Stores*,
    298 F. App'x 487 (6th Cir. Oct. 22, 2008) .......................................45
*Griffin v. City of Demorest*,
    635 F. App'x 701 (11th Cir. 2015)......................................... 29, 30, 35

*Griffin v. Ellingson*,
No. 2:13-CV-189-WCO-JCF, 2015 WL 11018254 (N.D. Ga. Jan. 30, 2015) ....35

*Hamilton v. Coffee Health Group*,
949 F. Supp. 2d 1119 (N.D. Ala. June 6, 2013) .................................................39

*Hawkins v. Ceco Corp.*,
883 F.2d 977 (11th Cir. 1989) ..........................................................................29

*Holland v. Gee*,
677 F.3d 1047 (11th Cir. 2012) .........................................................................21

*Hughes v. City of Lake City*,
No. 3:12-CV-158-J-32JBT, 2014 WL 1293525 (M.D. Fla. Mar. 28, 2014) .......39

*Jackson v. Alabama Dept. of Corrections*,
643 F. App'x 889 (11th Cir. 2016).............................................................. 24, 25

*Jackson v. United Parcel Serv., Inc.*,
593 F. App'x 871 (11th Cir. 2014)......................................................................38

*Johnson v. Reed Contracting Servs., Inc.*,
No. 5:14-CV-2131-AKK, 2016 WL 5407999 (N.D. Ala. Sept. 28, 2016)..........44

*Jones v. City of Atlanta*,
No. 1:13-CV-2669-WSD, 2015 WL 5725690 (N.D. Ga. Sept. 29, 2015)...........34

*Jones v. Procter & Gamble Paper Products Co.*,
No. 1:18-CV-046 (LAG), 2019 WL 11638413 (M.D. Ga. May 8, 2019) ..........42

*Joseph v. Bd. of Regents of the U. System of Georgia*,
121 F.4th 855 (11th Cir. 2024)..........................................................................44

*Joseph v. Bd. of Regents of U. System of Georgia*,
No. 1:20-CV-00502-VMC, 2023 WL 2393974 (N.D. Ga. Mar. 3, 2023)...........44

*Lane v. Terry*,
No. 1:08-CV-3781TWTWEJ, 2010 WL 2721896 (N.D. Ga. June 4, 2010) .......37

*Lewelling v. Farmers Ins. Of Columbus, Inc.*,
879 F.2d 212 (6th Cir. 1989) ...................................................................... 50, 51

*Lewis v. City of Union City, Ga.*,
918 F.3d 1213 (11th Cir. 2019) ................................................................... 20, 41

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) .........................................................................................20

*McGee v. Sentinel Offender Servs., LLC*,
719 F.3d 1236 (11th Cir. 2013) .........................................................................19

*McKenny v. U.S.*,
973 F.3d 1291 (11th Cir. 2020) .........................................................................37

*Moser v. Fla. Dep't of Corr.*,
709 F. App'x 985 (11th Cir. Sept. 25, 2017).....................................................45

*Muldrow v. City of St. Louis, Missouri*,
601 U.S. 346 (2024) ..................................................................23

*Naraine v. City of Hollywood*,
No. 21-CV-60313-RAR, 2022 WL 3577069 (S.D. Fla. Aug. 19, 2022) .............42

*Naraine v. City of Hollywood*,
2023 WL 6475507 (11th Cir. Oct. 5, 2023) .......................................42

*Oirya v. Auburn U.*,
831 F. App'x 462 (11th Cir. 2020).................................... 19, 20, 21

*Osterneck v. E.T. Barwick Industries, Inc.*,
825 F.2d 1521 (11th Cir. 1987)....................................................48

*Paylor v. Hartford Fire Ins. Co.*,
748 F.3d 1117 (11th Cir. 2014) ...................................................19

*Perry v. Walmart Inc.*,
No. 218CV606FTM29NPM, 2020 WL 1158719 (M.D. Fla. Mar. 10, 2020) .....41

*Pitney Bowes, Inc. v. Mestre*,
701 F.2d 1365 (11th Cir. 1983) ...................................................48

*Poer v. Jefferson Cnty. Comm'n*,
100 F.4th 1325 (11th Cir. 2024)........................................ 18, 19, 22

*Salter v. Upjohn Co.*,
593 F.2d 649 (5th Cir. 1979) .....................................................50

*Seminole Tribe of Fla. v. Stranburg*,
799 F.3d 1324 (11th Cir. 2015) ...................................................48

*Smith v. Barry*,
502 U.S. 244 (1992) ..............................................................48

*Smith v. City of Ft. Pierce, Fla.*,
565 F. App'x 774 (11th Cir. 2014)........................................ 36, 47

*Smith v. Lockheed-Martin Corp.*,
644 F.3d 1321 (11th Cir. 2011)....................................................21

*St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co.*,
198 F.3d 815 (11th Cir. 1999)......................................................17

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993) ..............................................................21

*Stevenson v. Delta Air Lines, Inc.*,
No. 116CV002571ATLTW, 2021 WL 2677018 (N.D. Ga. Apr. 13, 2021)........42

*Stevenson v. Delta Air Lines, Inc.*,
No. 16-CV-2571-AT, 2021 WL 5168274 (N.D. Ga. Sept. 29, 2021).................42

*Stevenson v. Delta Air Lines, Inc.*,
2023 WL 197052 (11th Cir. Jan. 17, 2023).......................................42

*Texas Dept. of Community Affairs v. Burdine*,
450 U.S. 248 (1981) ....................................................................... 20, 21
*Thomas v. Dolgencorp, LLC*,
645 F. App'x 948 (11th Cir. 2016)................................................... 25, 26
*Webb v. Atlanta Indep. Sch. System*,
No. 115CV001613RWSWEJ, 2017 WL 4334246 (N.D. Ga. Jan. 18, 2017) ......38
*Woodard v. Fanboy, L.L.C.*,
298 F.3d 1261 (11th Cir. 2002) ...........................................................35
*Wright v. Atlanta Pub. Sch.,*
No. 1:17-CV-975-ODE-LTW, 2019 WL 13413351 (N.D. Ga. July 19, 2019) ...34

Statutes

28 U.S.C. § 1291 .......................................................................................1
28 U.S.C. § 1331 .......................................................................................1
42 U.S.C. § 1981 .......................................................................................1

Rules

Fed. R. App. P. 3(c)(1)(B) ........................................................................48
Fed. R. App. P. 28(b)(2) ...........................................................................1
Fed. R. App. P. 32(a)(5)...........................................................................52
Fed. R. App. P. 32(f)................................................................................51
Fed. R. Civ. P. 56 ........................................................................... passim
Fed. R. Civ. P. 56(a)................................................................................17

## STATEMENT OF JURISDICTION

The U.S. District Court for the Middle District of Florida ("District Court")

had subject matter jurisdiction over this case under 28 U.S.C. § 1331 because

Plaintiff/Appellant Ebony Kelley's ("Appellant" or "Kelley") Complaint alleged

violations of 42 U.S.C. § 1981 ("Section 1981"). (DE 1.[1]) On October 22, 2024, the

District Court entered an Order granting Allegiant's Motion for Summary Judgment

and entered a Judgment in a Civil Case in favor of Allegiant the next day. (DE 74,

77.) On November 19, 2024, Appellant filed a Notice of Appeal to this Court from

the Summary Judgment Order (DE 82), and this action was assigned as Case No.

24-13815-C. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §

1291.

## STATEMENT OF THE ISSUES

Pursuant to Fed. R. App. P. 28(b)(2), Allegiant acknowledges the issues on

appeal as formulated by Appellant, subject to Allegiant's objections as stated in its

Response to Appellant's Civil Appeal Statement. (11th Cir. ECF 12.)

## STATEMENT OF THE CASE

### I.  PROCEDURAL HISTORY

On May 24, 2023, Appellant filed a two-count Complaint in the District Court,

alleging race discrimination and retaliation, in violation of Section 1981. (DE 1.)

---

[1] Allegiant's references to the District Court docket entries are denoted as "(DE __)," and references to the Eleventh Circuit docket entries are denoted as "(11th Cir. ECF __)."

Allegiant answered the Complaint on June 20, 2023, denying liability and asserting defenses. (DE 10.) In November 2023, Allegiant deposed Appellant; and Appellant deposed Allegiant's Employee Relations Specialist Anna Mortimer, St. Pete-Clearwater International Airport General Manager Angela Peterson, and Appellant's coworker, Ground Operations Agent ("GOA") Janelle Buch ("J. Buch"). (*See* DE 39, at p. 5.) On January 4, 2024, nearing the cutoff of discovery, Appellant moved to compel the "Apex" deposition of Allegiant's Chief Executive Officer ("CEO") Maurice Gallagher. (DE 24.) On February 16, 2024, the District Court denied Appellant's motion ("Discovery Order"), finding that Gallagher's single act of receiving and forwarding Appellant's email onto other Allegiant employees for handling did not make him a witness with unique knowledge of the issues in the case, and that Appellant failed to pursue the desired information through less intrusive means during discovery. (DE 39, at pp. 3-5.) By the same February 16, 2024, Discovery Order, the District Court directed Allegiant to supplement its document production in response to several of Appellant's discovery requests. (DE 39, at pp. 5-15.)

On January 29, 2024, Allegiant moved for summary judgment on both of Appellant's claims; on February 20, 2024, Appellant responded; and on March 5, 2024, Allegiant replied. (DE 33-36, 40-42.) After Allegiant served its document production to Appellant pursuant to the Discovery Order, on May 31, 2024,

Appellant moved the District Court to direct Allegiant to re-serve the unredacted versions of the same documents and allow Appellant an opportunity to supplement its summary judgment brief after that.[2] (DE 43.) On July 2, 2024, the District Court directed Allegiant to provide the unredacted documents to the District Court for *in camera* review. (DE 50.) After being satisfied that Allegiant's documents "contain[ed] privacy issues worthy of sealing," the District Court directed Allegiant to serve the unredacted versions to Appellant and granted Appellant an opportunity to supplement her opposition brief. (DE 53.) On August 6, 2024, Appellant filed a Surreply in Support of Her Opposition to Defendant's Motion for Summary Judgment; Allegiant responded to the same on August 20, 2024. (DE 55-1, 59.)

On October 22, 2024, after considering the summary judgment record including the parties' supplemental briefs, the District Court entered an Order granting Allegiant's Motion for Summary Judgment ("Summary Judgment Order") and entered a Judgment in a Civil Case in favor of Allegiant the next day. (DE 74, 77.) On November 19, 2024, Appellant filed a Notice of Appeal to this Court from the Summary Judgment Order, <u>only</u>. (DE 82.) Appellant's Notice said nothing about the District Court's February 16, 2024, Order denying Appellant's motion to compel the "Apex" deposition of CEO Gallagher. (*See* DE 82.)

---

[2] On June 1, 2024, the District Court entered an order on summary judgment, but shortly withdrew it, after recognizing that Appellant's May 31, 2024, motion implicated the issues raised in the parties' summary judgment briefings. (*See* DE 44-46.)

## II.  STATEMENT OF FACTS

### A.  Kelley's Employment at Allegiant

On February 23, 2021, Allegiant hired Kelley (African American) as a part-time Customer Service Agent ("CSA") Trainee to work at the St. Pete-Clearwater International Airport ("PIE") in Clearwater, Florida, reporting to Peterson. (DE 34 at ¶1.) After completing her training, Kelley became a part-time CSA on April 30, 2021; on April 1, 2022, she was reclassified to full-time. (DE 34 at ¶¶2, 23.)

Upon hire, Kelley received Allegiant's Team Member Handbook and knew she was required to follow Allegiant's policies and procedures. (DE 34 at ¶3.) Kelley also knew, pursuant to the EEO and Non-Discrimination/Harassment/Non-Retaliation policies, that, if she experienced discrimination, harassment, or retaliation, she could openly or anonymously report it to Allegiant through many reporting channels: a supervisor, manager, department director, or another leader; the Employee Relations or People Services departments; or by phone or online. (DE 34 at ¶4.) Kelley also knew she could be discharged from Allegiant for "[d]ishonesty, including . . . providing false information to the Company . . . during the course of a Company investigation." (DE 34 at ¶6.)

### B.  Kelley Complains About a Coworker Touching Her Hair

Kelley claims that at some point, her coworkers began to touch and comment on her hair. (DE 34 at ¶32.) Kelley claims coworker Stacey touched Kelley's hair

one time and asked if it was real. (DE 34 at ¶33.) At the time, Kelley told CSA Leads Trey Wingfield and Vivian Vega, who immediately pulled Stacey aside and counseled her, telling her this type of conduct/comment was inappropriate. (*Id.*) Stacey never touched or made any comments about Kelley's hair after this counseling. (*Id.*) Kelley received no adverse consequences for reporting Stacey. (DE 34 at ¶34.)

Besides Stacey, Kelley claims literally scores of GOAs commented on or touched her hair, "nearly every day"; yet, during her deposition, Kelley could not identify a single offender. (DE 34 at ¶35.) Kelley never complained to any lead or supervisor about this supposed constant hair-touching and comments, at the time it was allegedly happening. (DE 34 at ¶36.) Kelley admitted the alleged hair-touching and comments ceased by August-September 2022. (DE 34 at ¶37.)

During an attendance-related disciplinary meeting on November 22, 2022, Kelley, for the first time, told Peterson about Stacey's alleged hair touching and how it was immediately addressed, but never claimed she felt Stacey's actions were discriminatory. (DE 34 at ¶38.) Kelley did not want Peterson to do anything about it because the touching had ceased long ago. (*Id.*) Peterson agreed not to take any additional action, but asked Kelley to let her know if the behavior re-occurred, and Kelley assured Peterson that she would. (*Id.*)

### C.     Kelley Calls a White Coworker a "Racist"

Kelley and J. Buch were friendly at work and a part of the same group of CSAs and GOAs who hung out and took smoking breaks together. (DE 34 at ¶39.) Around 9:30 p.m. on November 20, 2022, J. Buch was in Allegiant's breakroom doing her required "Universities" (employment/policy training) on a company computer, when Kelley walked into the breakroom and demanded that J. Buch get up and let Kelley use the computer to enter her "gate notes" (flight information). (DE 34 at ¶40.) The breakroom computer J. Buch was using is specifically designated for GOAs to complete Universities. (DE 34 at ¶41.) Kelley could use any other airport computer, but specifically wanted to use the one J. Buch was using because Kelley (mistakenly) believed it was the only computer with printing ability and she needed to print something personal. (DE 34 at ¶41.) J. Buch did not get up and told Kelley to find another computer. (DE 34 at ¶42.) Kelley responded by saying either "This is racist!" or "Is this racist?"—J. Buch clearly heard the word "racist." (*Id.*) J. Buch calmly logged off the computer, gathered her personal things, left the breakroom without saying anything, and then asked Lead Reinaldo Berrios for permission to go home early. (DE 34 at ¶43.)

### D.     Allegiant Investigates J. Buch's and Kelley's Competing Allegations

J. Buch believed Kelley called her "racist" to intimidate and to force her to leave the computer. (DE 34 at ¶44.) J. Buch reported the breakroom incident to

Berrios and Peterson, who escalated her concerns to Employee Relations for an investigation. (*Id.*)

On November 28, 2022, Employee Relations Specialist-I Valentina Zacco and Peterson met with J. Buch to discuss her complaint. (DE 34 at ¶45.) After reiterating the events in the breakroom, J. Buch shared this was not the first time Kelley had made offensive comments—for example, Kelley previously implied J. Buch's family were slave-owners and told an African American coworker to "quit acting light-skinned." (*Id.*) After the meeting, J. Buch provided a written statement. (*Id.*) J. Buch identified Berrios and GOAs Carlos Huertas and Kalista Stone as witnesses to the breakroom incident. (DE 34 at ¶46.)

On December 12, 2022, Employee Relations Specialist-III Anna Mortimer and PIE Supervisor Phillip Marran interviewed Kelley concerning J. Buch's complaint. (DE 34 at ¶47.) Kelley claimed she asked J. Buch "nicely" to use the computer on the evening of November 20, 2022, and patiently waited for it, and that J. Buch left "angrily." (*Id.*) Kelley denied calling J. Buch "racist" or saying anything about race at all and noted that she and J. Buch had stopped talking a while ago, but denied ("No, not at all") that they had a falling-out. (*Id.*) Kelley claimed hearing a "buzz" about racial tensions at Allegiant that didn't involve her, and she offered no specifics about the alleged rumors. (*Id.*) Kelley also identified Berrios as a witness to the breakroom incident. (DE 34 at ¶48.)

Allegiant interviewed the witnesses identified by both Kelley and J. Buch. (DE 34 at ¶49.) On December 12, 2022, Mortimer and PIE Supervisor Szilvia Nemeth interviewed Huertas. (DE 34 at ¶50.) Huertas confirmed hearing Kelley make a racial statement to J. Buch; which he later shared in an email:

> The incident occurred at employee break room. Janelle was working on her universities I can hear Ebony talking Janelle to get off the computer for her to make use of it. Ebony was very persistent on trying to get Janelle out. Some words were exchange between them. Janelle was very calm regarding she did want to continue finishing her work. She did mention to Ebony that she can use the other computers to what Ebony refuse to do. I had to leave at the time to attend one of my flights. If I recall right a racial comment was made from Ebony to Janelle in the conversation. which I believe it was irrelevant to the matter.

(*Id.*) Next, Mortimer and Marran interviewed Berrios. (DE 34 at ¶51.) Berrios confirmed, both verbally and in writing, that he heard Kelley call J. Buch a "racist":

> As per our conversation Janelle was on the break room computer doing her universities ,myself and a few others where there as we in between flights.When i overhear Ebony telling Janelle that she needs to get of the computer because she has to put in her notes for her gate.Janelle then replied to her saying im in the middle of my universities,Ebony then again tells her that she needs to get off the computer and goes ahead and tells Janelle this is racist because she is white.Janelle then proceeds to log out of the computer and is clearly very upset and comes to me and ask if she can leave early.I knowing what i just heard and im sure a few others who where in the room heard as well told her yes ,dont worry go home.I couldnt believe what i just heard.The following day Janelle asked me if i heard what Ebony told her i said yes and told her if she choses to file a complaint that its her decision and if she needs me for anything to let me know but until yesterday i was unaware she did.Its was inappropriate and not necassary

(*Id.*) On December 19, 2022, Mortimer and Nemeth interviewed Stone, who also confirmed, verbally and in writing, that she heard Kelley use the word "race" when addressing J. Buch in the breakroom:

Statement: I was sitting a couple feet from the occurrence. Jenelle was using the computer to do her universities. Ebony comes in the room claiming that she must use the computer in order to complete her station's comments and print something. They continually go back and forth a little bit about both needed to use the computer.

Jennelle says "I'm using the computer for my universities. There are plenty of other computers you can use instead of this one."

Ebony then says "But this is the only computer that will let me print what I need printed. Is it because of race?"

Then Jennelle stopped talking after that was said.

(DE 34 at ¶52.)

On December 15, 2022, Kelley sent a written statement to Mortimer. (DE 34 at ¶53.) Kelley wrote that, on November 20, 2022, Kelley patiently waited for J. Buch to finish using the breakroom computer, but J. Buch was acting like a "bully" and "very mean" towards Kelley, and ultimately "stormed out" of the breakroom. (DE 34 at ¶54.) Kelley also alleged, for the first time, that J. Buch previously made the "most disrespectful comments about all races," but "mainly" Hispanics; said once that George Washington is the "only white person with that last name"; told Kelley to turn off her "ghetto" music; that J. Buch's brother (an Allegiant coworker) said he got sick after "hugging a black person"; and that someone overheard J. Buch, her sister Samantha Buch ("S. Buch"), an Allegiant coworker, or "some other CSA" say something about "getting this 'N****r Bitch' fired," which Kelley assumed was in reference to her. (*Id.*) Kelley admitted she "never reported" these alleged incidents to anyone, because Kelley believed J. Buch was just joking. (*Id.*)

After receiving Kelley's statement, Mortimer asked Kelley to provide specifics about the reported experiences with J. Buch—for example, dates or witnesses—so she could investigate them further; and asked Kelley to clarify if she made any prior complaints. (DE 34 at ¶55.) Kelley reiterated she had never previously reported the alleged conduct and could not identify one witness who could confirm J. Buch's alleged statements and whom Mortimer could interview as part of her investigation:

| | |
|---|---|
| **From:** | Ebony Kelley |
| **Sent:** | Saturday, December 17, 2022 6:01 AM |
| **To:** | Anna Mortimer |
| **Cc:** | Employee Relations |
| **Subject:** | Re: Statement |

I wish I did but unfortunately do not. All our interactions have been 1 on 1.

(DE 34 at ¶56; DE 36-8 at p. 1.) Kelley's complaint against J. Buch during Allegiant's ongoing investigation into Kelley's own misconduct was the first time Kelley raised these alleged concerns. (DE 34 at ¶56.)

On December 19, 2022, Mortimer and Nemeth met with Kelley concerning the interim investigation findings. (DE 34 at ¶57.) Mortimer told Kelley the witnesses corroborated J. Buch's version of the breakroom events (including J. Buch's and Kelley's respective demeanors) and Kelley's use of the word "racist"; undeterred, Kelley repeatedly denied invoking race in any context during her

interaction with J. Buch. (*Id.*) Kelley was suspended pending further investigation. (DE 34 at ¶58.)

A few hours after her suspension, Kelley emailed Las Vegas, Nevada-based Chairman of the Board and Executive Chairman (later, CEO) Gallagher, alleging there were "ongoing racial tensions" at Allegiant-PIE, without giving any specifics; claiming she had been "dealing with racism" and "stereotypes" in the workplace, implying her complaints were "swept under the rug," and claiming that she was just suspended for confronting a coworker about racism:

Hi Maury. My name is Ebony Kelley from pie International. Employee number 18519. I have been wanting to contact you for a while about the ongoing racial tensions here at allegiant. I really love working with allegiant but it's out of control how situations are handled here. I've been dealing with racism and all the stereotypes that go with it since I've started. Anytime I mentioned it, it was swept under the rug as me overreacting. I recently addressed a co worker about their racist comments and then I was placed on suspension pending investigation. I have been dealing with this stupid topic my entire life. Every since I was born as a brown baby. I am hurt. I feel let down and extremely offended that I am the one accused of such acts. I was wondering if you could possibly contact me so I can tell my story. Honestly I don't want to work in such a racially hostile environment anymore but I feel by communicating with you , it can prevent future incidents.

(DE 34 at ¶59.[3])

Pursuant to his usual course of conduct, CEO Gallagher forwarded Kelley's employee concern to Chief HR Officer Rebecca Henry for handling, with a comment: "R. See below. Have u seen this. M." (DE 34 at ¶60; DE 36-14 at p. 16.)

---

[3] In her Principal Brief, Kelley claims Gallagher was "familiar" with alleged "racial tensions at Allegiant-PIE" at the time he received Kelley's email because he previously addressed a concern brought forth by an African American Team Lead. (PB at pp. 7-8 (citing DE 43-1 at pp. 208, 20).) There is no record evidence that Gallagher's act of addressing (and remedying) an unrelated situation had anything to do with Allegiant's investigation of J. Buch's allegations against <u>Kelley</u>.

Henry forwarded the email to Manager of Employee Relations Adriana Ramirez, who forwarded it to Mortimer, to address as part of her ongoing investigation. (*Id.*) Seeing that Kelley claimed she was suspended after confronting "a coworker about their racist comments" despite adamantly denying that she ever invoked racism on November 20, 2022, Mortimer commented to Ramirez:

> Interesting. In both investigative meetings and her written statement she denied saying anything relating to racism to the employee in the situation because there was nothing racist that occurred. In her email below she states "she addressed her coworker about racist comments." There is a dishonesty issue with this employee.

(DE 36-14 at p. 16.[4])

On December 22, 2022, Mortimer and Peterson met with Kelley to discuss the claims raised in her email to Gallagher, including the contradictions with her prior statements during the internal investigation. (DE 34 at ¶61.) Kelley repeated her version of the breakroom incident; confirmed she had no witnesses to J. Buch's alleged past comments; said she did "not mean" to imply she was suspended for confronting a "racist coworker"; and could not provide <u>any</u> examples of "racism" or

---

[4] In the District Court, Kelley was advancing a theory, not based on the record, that the course of Allegiant's investigation changed after Kelley emailed Gallagher, because Kelley's email to the CEO "angered" Mortimer and she went on to pretextually terminate Kelley for dishonesty. (DE 40, at pp. 3-4, 10-11). Consistent with that theory, Kelley now claims in the Principal Brief that "Mortimer testified, prior to the Gallagher email, there were no allegations of dishonesty related to Kelley." (PB at p. 12 (citing DE 41-3 at ¶44:20-25).) The record citation Kelley offers to support this assertion does not support it. When asked if Kelley had "issues with dishonesty prior to this," Mortimer's testimony was, "Not that I'm aware of." (DE 41-3 at ¶44:20-25.) However, "this" in the "issues with dishonesty prior to this" referred to Mortimer's receipt of the third-party witnesses' accounts confirming Kelley's demeanor and use of the term "racist" on November 20, 2022, which contradicted Kelley's account and raised questions about her honesty—not Kelley's email to Gallagher. (DE 41-3 at 43:24-44:25.)

"stereotypes" in the workplace or complaints of "racism" or "stereotypes" that were "swept under the rug" by management. (*Id.*)

On December 22, 2022, Mortimer, Peterson, and PIE Manager Brock Gregory interviewed J. Buch concerning Kelley's allegations of J. Buch's past racial comments. (DE 34 at ¶62.) J. Buch denied the alleged conduct or offered reasonable, innocuous explanations. (*Id.*) Because Kelley did not identify any witnesses or objective evidence to support her claims against J. Buch, Allegiant could not reliably substantiate Kelley's allegations. (DE 34 at ¶63.)

### E. Allegiant Terminates Kelley for Dishonesty During an Internal Investigation

Allegiant determined, based on the witness statements and assessment of credibility, that Kelley did engage in the alleged conduct of calling J. Buch a "racist." (DE 34 at ¶64.) In addition, Allegiant concluded Kelley provided inconsistent, contradictory, and untruthful information during the investigation, in violation of Allegiant's Standards of Conduct.[5] (*Id.*) On December 28, 2022, Allegiant terminated Kelley for <u>dishonesty</u> during an internal investigation. (DE 34 at ¶65.) Kelley does not know a single non-African American CSA who both used a racist

---

[5] In her Principal Brief, Kelley focuses on Mortimer's reference in her December 27, 2022, email to then-COO Keny Wilper, Peterson, and the Employee Relations team to Kelley's email to Gallagher. (PB at p. 12.) When read as a whole, the December 27, 2022, email shows Kelley's email to Gallagher was referenced only as a part of Mortimer's timeline of the investigation and to illustrate Kelley's inconsistent statements, rather than to connect Kelley's termination with her <u>act</u> of sending that email. (*See* DE 41-5 at p. 2.)

term and was dishonest during an investigation, who was not terminated. DE 34 at ¶66.)

## F. Unrelated Complaints Against Other Individuals at Allegiant

In discovery, pursuant to the Court's Discovery Order, Allegiant produced documents concerning unrelated claims raised by other employees against various individuals, spanning over a two-and-a-half-year period:

- A <u>July 2021</u> complaint by an African American CSA against a white CSA concerning the use of the N-word. The complaint was investigated by Mortimer, and the white employee was terminated. (DE 54 at pp. 2-15.)

- A <u>December 2021</u> complaint by an Asian CSA alleging race discrimination against a white CSA supervisor. The complaint was investigated by Mortimer and not substantiated. (DE 54 at pp. 128-142.)

- An <u>October 2022</u> complaint by a white CSA (as initially communicated to Allegiant by an African American Team Lead) against a white GOA concerning the GOA's use of a racial term while singing karaoke at an off-site, after-hours event at Mugs & Jugs (a bar) that was investigated by Mortimer and others as part of a larger investigation. (DE 54 at pp. 16-78.)

- A <u>January 2024</u> complaint by an hourly Hispanic CSA against another hourly white CSA concerning an uncomfortable work environment and the use of racial comments in the workplace. The Employee Relations team

(not Mortimer) investigated the complaint. (DE 54 at pp. 79-127.)

There is no record evidence to suggest that any of these complaints—two of which were made months prior, and one of which was made over a year after Kelley's termination—or the subsequent investigations by Allegiant, were related to Kelley or Allegiant's investigation into competing allegations between Kelley and J. Buch in late 2022.

## SUMMARY OF THE ARGUMENT

The District Court did not improperly "recalibrate" summary judgment burdens between Appellee and Appellant. Rather, the ultimate burden on summary judgment—when proceeding either under the *McDonnel Douglas* or the "convincing mosaic" framework for proving employment discrimination—was always on Appellant to prove that she was a victim of intentional discrimination and retaliation. Appellant failed to carry out that burden.

The District Court did not err by considering the "reasonableness" of Allegiant's investigation and conclusions and did not thereby "usurp" the role of the jury. Rather, courts routinely consider the employer's reasonable beliefs about the employee's conduct during their internal investigations and ask whether a "reasonable" employer would have made the same decisions.

Even if Allegiant (Mortimer) mistakenly believed that Appellant made inconsistent and dishonest statements during the internal investigation—crediting

Appellant's claim of consistency and truthfulness—the relevant issue is Allegiant's good-faith belief, based on information available, regarding Appellant's conduct. The District Court did not err in finding that Mortimer's belief that Appellant was dishonest during an investigation was made good-faith.

Appellant's "evidence" regarding CEO Gallagher's involvement in addressing an unrelated employee complaint does not demonstrate "ongoing" racial tensions at Allegiant, nor does it justify reversing summary judgment in this case.

The District Court did not err in finding that Appellant failed to create a convincing mosaic of discrimination, with evidence of suspicious timing, ambiguous statements, or other information. Appellant's "me too" evidence did not show that she was a victim of intentional discrimination.

The District Court did not err in finding that Appellant failed to identify comparators who used a racist term and were dishonest during an investigation and were not terminated. Even assuming the Buch sisters used racist terms, there is absolutely no record evidence that they were accused or found dishonest during an internal investigation.

The District Court did not err in finding that Allegiant could suspend and terminate Appellant shortly after her December 2022 complaint—made during Allegiant's active, ongoing investigation into Appellant's misconduct—because

Allegiant was free to proceed "along lines previously contemplated, though not yet definitively determined" despite Appellant's intervening complaint.

Magistrate Judge Sean Flynn's Discovery Order denying Appellant's motion to compel the "Apex" deposition of Allegiant's CEO Gallagher is not properly before this Court. The Magistrate Judge correctly found Appellant failed to show that CEO Gallagher had unique or special knowledge requiring a deposition and Appellant did not attempt less intrusive methods to obtain the same information. Appellant did not appeal this decision.

For the reasons herein, the Court should affirm the District Court's Order granting summary judgment in favor of Allegiant on all claims.

## LEGAL ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co.*, 198 F.3d 815, 819 (11th Cir. 1999). "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law." *Salas as Tr. of Salas Child. Tr. v. Commonwealth Land Title Ins. Co.*, No. 22-12264, 2023 WL 6866620, at *2 (11th Cir. Oct. 18, 2023) (citing Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

## II. THE DISTRICT COURT CORRECTLY APPLIED FED. R. CIV. P. 56 TO FIND THAT APPELLANT HAD NOT CREATED ANY GENUINE ISSUES OF MATERIAL FACT FOR TRIAL

Kelley's first argument is that "[t]he District Court did not apply Rule 56" (PB at p. 15[6]). Kelley's argument is supported by the following:

### A. Kelley Misunderstands the Summary Judgment Burdens

Kelley argues the District Court improperly "recalibrated" burdens on summary judgment when it held, for example, that Kelley "ha[d] failed to **prove** that Allegiant's desire to retaliate was the 'but for' cause of her suspension and termination" whereas "[a]t the summary judgment stage," according to Kelley, she "was not required to prove anything" at all, and "[t]he burden was supposed to be on Allegiant, not Kelley." (PB at p. 16 (bolding in the original).) Kelley's argument shows a misunderstanding of the summary judgment burdens.

The nature of the summary judgment burden under Fed. R. Civ. P. 56 varies depending on which party would bear the burden of proof on a disputed issue at trial. *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1335 (11th Cir. 2024) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). Where, as here, a defendant moves for summary judgment on an issue for which it would not bear the burden of proof at trial, it is not necessary for the defendant to entirely negate

---

[6] Appellee will cite to Appellant's Principal Brief as "PB." When citing to Appellant's Principal Brief, Allegiant will use the actual brief pages rather than page ID numbers.

the plaintiff's claim. *Id.* (citing *Fitzpatrick*, 2 F.3d at 1115-16; *Celotex Corp.*, 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.")). Instead, the movant "has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.* at 1335-36 (citing *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013)).

Once a summary judgment movant's initial burden is met, "the burden shifts to the nonmoving party to bring the court's attention to evidence demonstrating a genuine issue for trial." *Id.* at 1336 (citing *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1121 (11th Cir. 2014). "Overcoming that burden requires more than speculation or a mere scintilla of evidence." *Id.* (citing *Paylor*, 748 F.3d at 1122). The non-movant must "go beyond the pleadings," to provide evidence and "designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 324). The non-movant will survive summary judgment in this instance only if she can demonstrate "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Id.* (citing *Doe v. Drummond Co.*, 782 F.3d 576, 604 (11th Cir. 2015)).

Section 1981 claims are analyzed in the same manner as claims brought under Title VII. *Oirya v. Auburn U.*, 831 F. App'x 462, 463-64 (11th Cir. 2020) (citing

*Butler v. Ala. Dept. of Transp.*, 536 F.3d 1209, 1215 (11th Cir. 2008)). Facing a

motion for summary judgment, a plaintiff asserting an intentional violation of

Section 1981 must make a sufficient factual showing to permit a reasonable jury to

find in her favor. *Id.* at 464 (citing *Lewis v. City of Union City, Ga.*, 918 F.3d 1213,

1217 (11th Cir. 2019) (en banc)). One way to meet this burden is through the burden-

shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Oirya*, 831 F. App'x at 464. Under *McDonnell Douglas*, the plaintiff is first required

to establish a *prima facie* case of discrimination or retaliation. *Id.* If she does, a

presumption arises that the employer acted illegally, which the employer can rebut

by presenting a legitimate, non-discriminatory/non-retaliatory reason for its decision

(the employer's burden at this stage is an "exceedingly light" burden of production,

not of persuasion). *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248,

256 (1981) (clarifying the burdens); *Flournoy v. CML-GA WB, LLC*, 851 F.3d 1335,

1339 (11th Cir. 2017) ("exceedingly light" burden of production). If it does so, the

plaintiff must show that the employer's proffered reasons were merely pretextual.

*Oirya*, 831 F. App'x at 464; *Burdine*, 450 U.S. at 256 ("[t]he plaintiff retains the

burden of persuasion" after the employer has met its burden of production).[7] Despite

these shifts in the burden of production, the ultimate burden of persuasion to show

---

[7] The District Court correctly discussed this burden-shifting in its Summary Judgment Order. (*See* DE 74 at pp. 21-22.)

that the employer intentionally discriminated or retaliated against the employee rests with the employee. *See Oirya*, 831 F. App'x at 464; *see Alvarez v. Royal A. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) ("[T]he ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against her."); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993).

Establishing the elements of *McDonnell Douglas* framework is only one method or evidentiary tool by which a plaintiff can prove discrimination by circumstantial evidence, and a plaintiff may also present "a convincing mosaic" of circumstantial evidence that raises a reasonable inference that the employer intentionally discriminated against her.[8] *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). If the plaintiff elects the "convincing mosaic of circumstantial evidence" framework, however, she still has to carry out the "ultimate burden" of persuading the finder of fact that she has been the victim of intentional discrimination. *Holland v. Gee*, 677 F.3d 1047, 1055-56 (11th Cir. 2012) (citing *Burdine*, 450 U.S. at 256).

In its Motion for Summary Judgment, Allegiant met its initial burden of demonstrating the absence of genuine issues of material fact regarding Kelly's

---

[8] The District Court discussed this alternative method of proving intentional discrimination in its Summary Judgment Order. (*See* DE 74 at p. 22.)

claims of discrimination and retaliation. <u>With respect to Kelley's race-based discriminatory discharge claim</u>,[9] Allegiant established that Kelley cannot prove (1) she was qualified for her CSA position, (2) she was treated less favorably than similarly situated comparators, (3) her race was the but-for cause of her termination, or (4) sufficient evidence of race discrimination. <u>Regarding Kelley's retaliation claim</u>, Allegiant demonstrated that Kelly could not: (1) establish participation in statutorily protected activity for at least some of her complaints, or (2) prove "but-for" causation between any protected activity and her termination. (DE 33 at pp. 9-17.) Because Allegiant met its summary judgment initial burden, Kelley was required "to bring the court's attention to evidence demonstrating a genuine issue for trial." *Poer*, 100 F.4th at 1336. The District Court correctly found that Kelley could not meet that burden <u>with respect to her discrimination case</u> because, (1) even if Kelly was initially qualified for her CSA position, having held it for most of her time at Allegiant, she became unqualified when she stopped demonstrating truthfulness and openness during the investigation; (2) Kelley failed to identify a similarly situated non-African American CSA who was retained after using a racist term and being dishonest during an internal investigation; and (3) Kelley failed to create a convincing mosaic of discrimination through suspicious timing, ambiguous

---

[9] Kelley was initially pursuing a failure-to-promote claim in addition to the disparate treatment claim, but abandoned it in the District Court, and is also not pursuing it on appeal.

statements, systematic better treatment of similarly situated employees, or other supporting information. (DE 74 at pp. 22-31.) The District Court also correctly found that Kelley could not meet her burden <u>with respect to her retaliation case</u> because she did not establish causation between any alleged statutorily protected activity and her suspension and ultimate termination. (DE 74 at pp. 36-39.) Although the District Court's inquiry could have stopped there, the Court nonetheless examined Allegiant's proffered legitimate reason for Kelley's termination. The Court determined that Kelley could not prove this reason was pretextual and, ultimately, failed to meet her burden of proving that she was a victim of intentional discrimination or retaliation. (DE 74 at pp. 32-36.)

Kelley seemingly takes issue with the District Court's use of the word "prove" in the statement that "[Kelley] has failed to prove that Allegiant's desire to retaliate was the 'but-for' cause of her suspension and termination." (PB at pp. 13-14, 16.) As shown, the District Court was right to conclude that Kelley had the ultimate burden of proving retaliation, and she failed to do so.[10]

---

[10] Kelley also claims, by relying on *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024), that "[a] claim for race discrimination can exist where race was the but for cause of 'some harm,' even if that harm did not rise to the level of suspension or termination." (PB at p. 16.) Kelley does not explain which "harm" the District Court may have overlooked in its Summary Judgment Order, or how the *Muldrow* standard for adverse action supports her argument about the District Court's "recalibration" of summary judgment burdens.

### B.    The District Court Appropriately Held That Mortimer's Investigation and Conclusions Were "Reasonable"

Kelley criticizes the District Court for finding that Mortimer's investigation, witness credibility assessment, and/or conclusion that Kelley was inconsistent in her statements during a company investigation were "reasonable." (PB at pp. 16-17.) Kelley argues it was an improper determination under Fed. R. Civ. P. 56, claiming the Court "usurp[ed] the role of the jury" and improperly "resolved all inferences in favor of Allegiant." (PB at p. 17.) The District Court's inquiry at the non-discriminatory/non-retaliatory reason stage of the *McDonnell Douglas* analysis properly focused on Allegiant's "reasonable" beliefs, and at the pretext stage, the reason for Kelley's termination was properly assessed from the perspective of a "reasonable" employer.

*Jackson v. Alabama Dept. of Corrections*, 643 F. App'x 889 (11th Cir. 2016) illustrates this point. In *Jackson*, Jackson argued on appeal from summary judgment in favor of the Alabama Department of Corrections (DOC) that the DOC's proffered reason for her termination was pretextual. *Id.* at 892. Jackson argued she did not receive an opportunity to tell her side of the story; the DOC's policies recommended suspension rather than termination for a first offense of fighting; and Jackson was treated differently than a white coworker with whom she fought. *Id.* The Court reminded that "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs," and that "[a] plaintiff may not establish that an employer's

24

proffered reason is pretextual merely by questioning the wisdom of the employer's reason, as long as the reason is one that might motivate a reasonable employer." *Id.* at 893. The Eleventh Circuit held a reasonable jury could <u>not</u> have found the DOC's proffered reason was pretextual where the DOC's policies included an option to enhance punishment in light of aggravating circumstances, which was done, and where Jackson and the white coworker were not similarly situated in that the white coworker never hit back Jackson. *Id.* at 893-94. The Eleventh Circuit held the DOC's investigation and conclusions were "<u>reasonable</u>" in that respect: "[D]efendants . . . <u>reasonably</u> believed that [Jackson] was the aggressor in the altercation, and it is the employer's beliefs that are relevant." *Id.* at 894 (underlining added). The Court concluded the district court did not err in finding that Jackson could not prove the DOC's reason for the adverse action was pretextual. *Id.*

Likewise in *Thomas v. Dolgencorp, LLC*, 645 F. App'x 948 (11th Cir. 2016), the Eleventh Circuit affirmed summary judgment in favor of the employer where no genuine issue of material fact existed on the issue of pretext. *Id.* at 951. Although the company listed two mutually exclusive reasons for Thomas's termination—that she took computer-based learning training (CBL) for employees or worked them "off the clock" without compensation—neither reason was pretextual because the employer believed the employee had committed one offense or the other, and either was grounds for termination. *Id.* at 952. More to the point here, the Court held that

Thomas's denial that she took CBLs for employees was immaterial, because the evidence showed the company-assigned investigator "conducted an investigation that yielded evidence upon which she had a <u>reasonable</u> good-faith basis to believe that Thomas had falsified records." *Id.* (underlining added).

*Jackson* and *Thomas* illustrate that the analysis regarding "reasonableness" of employers' actions and beliefs is commonplace in the employment discrimination context, and the court's determinations regarding the same do not usurp the role of a jury. Here, the District Court could, and properly held, that (1) Allegiant "reasonably found" no evidence of comparators who both invoked racism and was found dishonest during an internal investigation, but was not terminated; (2) despite some variation in the witnesses' recollections as to the specific words uttered by Kelley towards J. Buch on November 20, 2022, it was not "unreasonable" to conclude, in light of the witnesses' verbal and written statements and Mortimer's credibility determinations, that Kelley did invoke racism on that evening; and (3) Mortimer's assessment that Kelley's statements wavered throughout the course of the investigation was "reasonable." (DE 74 at pp. 22-23, 26, 28, 33.) In reaching its conclusions, the District Court did not make its own credibility determinations,[11] as

---

[11] The District Court specifically noted it was making these conclusions "[w]ithout making any credibility determinations." (DE 74 at p. 28.)

Kelly suggests. Instead, it properly focused on the reasonableness of Allegiant's actions and beliefs based on the available information.

### C. The Key Issue Is Whether Allegiant's Belief Was Made in Good Faith

Kelley cannot prove pretext because Allegiant's decision was based on its good faith, honest belief that Kelley was untruthful during its internal investigation, even if that reason is ultimately found to be incorrect. To bypass this rule, Kelly argues the following:

> [T]he District Court repeatedly ignores one of Kelley's central contentions: Kelley has consistently testified that she did not call J. Buch a racist or accuse her of racism in the break room *on November 20, 2022*. Kelley told Allegiant that she did not call J. Buch a racist in the break room *that day*. But Kelley also testified that she *previously* complained about J. Buch's racist behavior and racial harassment—just not in the break room *that day*. Allegiant conflated all of this to create the following narrative: Kelley said she did not call J. Buch a racist. But then Kelley said she did call out J. Buch's racism. So, Kelley is a liar.

(PB at p. 17.) What Kelley essentially argues is that: (1) she never wavered in her statements during Allegiant's internal investigation that she did not call J. Buch a racist on November 20, 2022; (2) she never wavered in her statements that she accused J. Buch of racism *on prior occasions*; and (3) in her December 19, 2022, email to CEO Gallagher, she did not inconsistently claim that she confronted J. Buch about racism on November 20, 2022—rather, she was referring to confronting J. Buch *on prior occasions* in her email, and both Mortimer, Allegiant, and the District

Court misunderstood that she was referring to a prior occasion, not to November 20, 2022.

Kelley misses the point of the good-faith belief rule. Here, Allegiant terminated Kelley's employment based on its good-faith, honest belief of her dishonesty during its internal investigation. Allegiant's belief was based on an initial complaint regarding Kelley's bullying and use of the word "racist,"[12] a month-long investigation,[13] the interviews and statements of multiple eyewitnesses,[14] and Kelley's own verbal and written words.[15] But even <u>assuming</u> that Allegiant misunderstood all of this, assuming it is true that Kelley was honest and did not waver in her statements, and assuming that all four witnesses were mistaken, or even lying, about what they heard Kelley say on November 20, 2022—what matters, for purposes of the *McDonnell Douglas* analysis (termination reason and pretext) is what Allegiant honestly, in good faith believed concerning the events that led to Kelley's suspension and termination. There is no record evidence here to suggest that Allegiant did not honestly, in good faith believe that Kelley was dishonest during its internal investigation and suspended and terminated her for that reason

---

[12] (DE 34 at ¶¶44, 64.)

[13] (DE 34 at ¶¶45, 64-65.)

[14] Three disinterested witnesses (including one identified by Kelley) substantiated Kelley's use of a variation of the word "racist" on November 20, 2022. (DE 34 at ¶¶49-52; 64.)

[15] Kelley repeatedly denied using the term "racist" towards J. Buch on November 20, 2022, during Allegiant's investigation and thereafter. (*See* PB at p. 17 ("Kelley has consistently testified that she did not call J. Buch a racist or accuse her of racism in the break room on November 20, 2022."); DE 40, at p. 8 ("Plaintiff has not wavered in her position that she is telling the truth."); DE 55-2 at p. 5 ("Plaintiff is telling the truth about the events of November 20, 2022.").)

only. *See E.E.O.C. v. Total Sys. Servs., Inc.,* 221 F.3d 1171, 1176 (11th Cir. 2000) (defendant's good faith belief that the employee lied in an internal investigation offered a legitimate nondiscriminatory and nonpretextual reason for the employee's termination); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466 (11th Cir. 1991) (commenting that it did not matter whether the employee was in fact guilty of harassment and even assuming the witnesses were "lying through their teeth"; what mattered was what the employer honestly believed about the employee's conduct); *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n.2 (11th Cir. 1989) (that the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong). The inquiry ends here. Inconsistencies, contradictions, and half-truths are a good faith basis for termination of employment; all reasons that factored into Allegiant's legitimate reason for Kelley's suspension and termination, and supported summary judgment in Allegiant's favor. *See, e.g.*, *Griffin v. City of Demorest*, 635 F. App'x 701, 707 (11th Cir. 2015) (affirming summary judgment where plaintiff was fired for being untruthful during an internal investigation where he claimed during the investigation that he did not bypass his chain of command by discussing confidential information about an undercover investigation with a councilmember, but then claimed he did not remember, but at the same time, there was additional evidence showing that he did discuss confidential information outside the chain of command).

### D. CEO Gallagher's Participation, in Some Way, in Remedying Another Employee's Unrelated Complaint Does Not Support a Reversal of Summary Judgment

Kelley argues: "Allegiant represented that Gallagher had no personal knowledge or involvement in this matter," but, "the documents Allegiant produced late in the litigation showed that Gallagher was personally and contemporaneously involved with the ongoing race problem at Allegiant-PIE." (PB at p. 18.) "Even after that subterfuge," Kelley laments, "the District Court still credits Allegiant as the party telling the truth. Again, that is improper and not in accordance with Rule 56 and binding appellate case law." (*Id.*)

Kelley's conclusion that "Gallagher was personally and contemporaneously involved with the ongoing race problem at Allegiant-PIE" appears to be extrapolated from an email of a former lead to Allegiant's management and Employee Relationship teams (but not Gallagher) as part of Allegiant's <u>unrelated</u> investigation into an <u>unrelated</u> complaint, which referenced, in relevant part, a past situation involving the lead that happened at some unknown time and in response to which Gallagher took "action":

> Coming into work for the second time thinking someone is deliberately trying to sabotage me or directly being insubordinate with me because of the color of my skin is absolutely unacceptable. The first time Maury [Gallagher] and Ken assured me that [A]llegiant doesn't want anyone like that working at this company! . . . Simply THANK YOU for returning my call and tell Maury I still laugh because I thought those birthday emails were bogus until he responded and I told him what happened and action began immediately.

(DE 43-1 at pp. 28, 30.) What can perhaps be inferred from this email is that CEO Gallagher did not want "anyone [who acted in a discriminatory or insubordinate way] working" for Allegiant and took "immediate" action with respect to whatever the lead told him "happened." Kelley's sweeping conclusion based on the foregoing that Gallagher was "personally and contemporaneously involved with an ongoing race problem at Allegiant-PIE" is not supported. Nothing in this irrelevant email demonstrates that Gallagher had some unique personal knowledge or involvement with Allegiant's November-December 2022 investigation of Kelley's conduct. More importantly, nothing in this email showing that CEO Gallagher was involved in some way in remedying another employee's complaint supports reversal of the summary judgment on Kelley's individual discrimination and retaliation claims in favor of Allegiant.

## III. APPELLANT DID NOT OFFER SUFFICIENT CIRCUMSTANTIAL EVIDENCE OF RACE DISCRIMINATION TO SURVIVE SUMMARY JUDGMENT

Kelley argues, proceeding under the "convincing mosaic" theory of proof, that "the District Court erred by failing to determine that she articulated a sufficient mosaic of circumstantial evidence to proceed to trial." (PB at p. 20.)

### A. Kelley Has Not Created a Convincing Mosaic of Discrimination by Suspicious Timing, Ambiguous Statements, or Otherwise

With respect to "Suspicious Timing and Ambiguous Statements and Other Information," the District Court held Kelley failed to raise genuine issues of material

fact that race could be inferred as the true reason for her suspension and termination. (DE 74 at p. 26.) In arriving at this conclusion, the District Court considered that Mortimer had twice interviewed Kelley; interviewed the third-party witnesses to the November 20, 2022, breakroom incident who corroborated J. Buch's version of what occurred; and reviewed all written witness statements; and that, based on her knowledge gained through that investigation, Mortimer could reasonably conclude that Kelley's statements during the investigation, including in Kelley's email to Gallagher, were dishonest and/or contradictory. (DE 74 at pp. 26-27.) Kelley argues the District Court "fail[ed] to account for the fact that upon seeing the Gallagher email, Mortimer called into question Kelley's honesty and ignored the fact that Kelley had already provided Mortimer with a written statement that (a) articulated specific instances of racism she had allegedly encountered with J. Buch (and her siblings) in the months leading up to November 20, 2022 and (b) maintained her position that she had not brought up race on November 20, 2022. (PB at pp. 20-21.) Kelley essentially argues once again that both Mortimer and the District Court failed to understand the references in her email and incorrectly concluded that she was being dishonest. The District Court did not fail to account for this argument and correctly dismissed it:

> On its face, the email does not refer to past incidents (before November 20) concerning racial comments. Plaintiff's prior position that nothing was said about race in the breakroom, when contrasted with the email

stating she was fired for addressing racist comments with her co-worker, clarify the incompatibility of the two statements.

(DE 74 at p. 26). When reviewing Kelley's email, which is what Mortimer and the District Court both did, it was reasonable to conclude that Kelley was referencing her November 20, 2022, interactions with J. Buch—not some past interactions—and so it was reasonable for Mortimer to conclude there was "a dishonesty issue" with Kelley, without considering Kelley's written statement or interviewing J. Buch.

Kelley argues the District Court "impermissibly found that no reasonable jury could conclude that Kelley was telling the truth despite the inconsistent statements provided by the alleged witnesses to the November 20, 2022 incident." (PB at p. 21.) Kelley suggests Allegiant could have "question[ed] witnesses regarding inconsistencies in their statements and when reviewed against one another," "record[ed] the interviews," or "question[ed] all people who J. Buch claimed witnessed the incident" (presumably, someone by the name "Michael" (or "Ace")[16]). (PB at pp. 9, 21.) Kelley essentially argues the District Court should have found that Allegiant could have done something more or different during its investigation of Kelley's alleged conduct. However, the proper inquiry is not what else, if anything, Allegiant could have done, but rather whether Allegiant's decision to suspend and terminate Kelley based on the available information was honest and in good faith.

---

[16] There is no evidence in the record as to why Michael "Ace" was or was not interviewed during Allegiant's investigation.

"[C]ourts do not sit as a super-personnel department that reexamines an entity's business decisions," even where the plaintiff may think that, for one reason or another, the investigation was incomplete or faulty. *See Total System Services, Inc.*, 221 F.3d at 1176 ("When an employer is told of improper conduct at its workplace, the employer can lawfully ask: is the accusation true? When the resulting employer's investigation . . . produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions—that is, to accept one as true and to reject one as fictitious—at least, as long as the choice is an honest choice. And, at least when the circumstances give the employer good reason to believe that the fictitious version was the result of a knowingly false statement by one of its employees, the law will not protect the employee's job."); *e.g.*, *Wright v. Atlanta Pub. Sch.,* No. 1:17-CV-975-ODE-LTW, 2019 WL 13413351, at *5 (N.D. Ga. July 19, 2019) (while crediting the plaintiff's argument that the employer's "decision making was flawed for failure to obtain both sides of the story" during its investigation, the court reminded that federal courts do not sit as a super-personnel department that reexamines an entity's business decisions, no matter how medieval a firm's practices, how high-handed its decisional process, and how mistaken the firm's managers (citing *Elrod*, 939 F.2d at 1470)); *Jones v. City of Atlanta*, No. 1:13-CV-2669-WSD, 2015 WL 5725690, at *22-23 (N.D. Ga. Sept. 29, 2015) (over the plaintiff's protest that the company's investigation was faulty because the

investigator was asking leading questions or typing up the witnesses' verbal statements, the court concluded it was the employer's prerogative to consider whether or not the plaintiff's comment leading to his termination was sufficiently offensive because "that is the sort of second-guessing of business decisions in which the Courts are not to engage"); *Griffin v. Ellingson*, No. 2:13-CV-189-WCO-JCF, 2015 WL 11018254, at *19 (N.D. Ga. Jan. 30, 2015) (plaintiff's argument that the investigation was faulty or a sham was not sufficient to show pretext. A plaintiff does not succeed in showing pretext by establishing that the decision-maker "was mistaken about the facts upon which [it] based [its] alleged non-discriminatory decision." (citing *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002))), *aff'd sub nom. Griffin*, 635 F. App'x 701 (employer may legitimately terminate employee based on its good-faith belief that employee lied during internal investigation).

Finally, Kelley argues that, "[w]ithin eight days of emailing . . . Gallagher, Mortimer recommended Kelley be terminated, and pointed again to the Gallagher email as a predicate." (PB at p. 21.) The District Court correctly found there was "nothing suspicious about the timing of [Kelley's] termination, which occurred several days after her dishonesty was discovered and with the benefit of additional interviews of Buch and [Kelley], as well as Buch's second written statement." (DE 74 at p. 28.) Further, Kelley again misstates the record by claiming Mortimer

"pointed again to the Gallagher email as a predicate" for her termination, whereas

Mortimer only mentioned that Kelley emailed Gallagher when recapping the

timeline of the investigation and to illustrate Kelley's inconsistent statements, rather

than to connect Kelley's termination with her <u>act</u> of sending the email. (*See* DE 41-

5 at p. 2.) Moreover, Kelley was already suspended when she emailed Gallagher, so

it is neither "suspicious" nor unusual that Allegiant went ahead with the termination

action several days after suspending Kelley for the same reason. *Clark Cnty. Sch.*

*Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (employers need not suspend previously

planned actions because of intervening protected activity; "proceeding along lines

previously contemplated, though not yet definitively determined, is no evidence

whatever of causality"); *Smith v. City of Ft. Pierce, Fla.*, 565 F. App'x 774, 779

(11th Cir. 2014) (no causal relation between filing of charge and being placed on

administrative leave where employee was already on administrative leave when she

filed charge and employer could subsequently proceed to terminate her despite

pending charge). The District Court did not err.

### B.  Kelley Has Not Created a Convincing Mosaic of Discrimination with Her Alleged "Me Too" Evidence

In discovery, pursuant to the Court's Discovery Order, Allegiant produced

documents concerning unrelated claims raised by other employees at various other

points in time against various other individuals at Allegiant (none of the ones about

whom Kelley complained): (1) an African American CSA's July 2021 complaint

against a white CSA, as a result of which the white CSA was terminated; (2) an Asian CSA's December 2021 complaint against a white CSA supervisor that was not substantiated; (3) a white CSA's October 2022 complaint (as initially communicated to Allegiant by an African American team lead) against a white GOA concerning the use of a racial term while singing a karaoke song at an off-site, after-hours event at a bar that started a broader investigation; and (4) a Hispanic CSA's January 2024 complaint against a white CSA about an uncomfortable work environment and the use of racial comments. (DE 54 at pp. 2-142.) From these unrelated complaints and investigations spanning over a two-and-a-half-year period, Kelley pieced together a narrative of "rampant racism," "heightened racial tensions," and "racial rancor that had engulfed Allegiant-PIE." (PB at pp. 4, 14, 19, 22, 23.) However, no amount of wordsmithery by Appellant's counsel can make up for the lack of record evidence reflecting the same. *McKenny v. U.S.*, 973 F.3d 1291, 1302 (11th Cir. 2020) (counsel's arguments in briefs are not Fed. R. Civ. P. 56 evidence).

Kelley brought a claim for individual race discrimination and has raised no claims of a hostile work environment or a pattern or practice of discrimination at Allegiant-PIE in the Complaint. (*See* DE 1.) To survive summary judgment, therefore, Kelley had to prove intentional discrimination as to herself.[17] (*See* DE 74

---

[17] *E.g.*, *Lane v. Terry*, No. 1:08-CV-3781TWTWEJ, 2010 WL 2721896, at *17 (N.D. Ga. June 4, 2010) (where plaintiff tried to introduce evidence of "pattern of anti-White discrimination" to

at p. 29.)

The District Court correctly found that Kelley's "me too" evidence consisting of bits-and-pieces from Allegiant's other, unrelated investigations spanning over two and a half years did not, under the circumstances of this case, create genuine issues of material fact for trial. *See, e.g.*, *Chandler v. Sheriff, Walton Cnty.*, No. 22-13698, 2023 WL 7297918, at *10-11 (11th Cir. Nov. 6, 2023) (affirming summary judgment for the employer where the plaintiff submitted "me too" evidence that two other employees who complained of discrimination were terminated, but those employees complained of a different form of discrimination and worked under a different supervisor, limiting the probative value of evidence of their termination in inferring intent to discriminate on the part of the plaintiff's supervisors (citing *Goldsmith v. Bagby Elevator, Inc*., 513 F.3d 1261, 1285-87 (11th Cir. 2008))); *Jackson v. United Parcel Serv., Inc.*, 593 F. App'x 871, 877 (11th Cir. 2014) (me-too evidence of discrimination against other employees, offered by employee in opposition to summary judgment was not relevant to motive, intent, or knowledge of manager who made promotion selection with respect to plaintiff).[18]

---

prove discrimination, court found "action [did] not include a pattern and practice claim"; "the only relevant evidence is that pertaining to the actions taken against Mr. Lane").

[18] *See also, e.g.*, *Webb v. Atlanta Indep. Sch. System*, No. 115CV001613RWSWEJ, 2017 WL 4334246, at *2 (N.D. Ga. Jan. 18, 2017) (coworkers' declarations constituted "me too" evidence which was irrelevant because the case was not a pattern and practice; what was relevant was the action taken against the plaintiff); *Davis v. Dunn Construction Co.*, 872 F. Supp. 2d 1291, 1318 (N.D. Ala. 2012) (employer's history of hostility towards African Americans and other allegations were a "watered-down version of 'me too' evidence" that was insufficient to create an inference

In the Summary Judgment Order, the District Court also considered Kelley's argument that Allegiant failed to adequately investigate, before she was suspended, her allegations of racist comments made by J. Buch in the past, as well as other comments either overheard by or said by random employees at various times and places. (DE 74 at p. 29.) The Court correctly found that Kelley had not brought a hostile work environment claim nor a pattern and practice claim of discrimination, and that she was required to prove intentional discrimination as to herself. (*Id.*) The District Court correctly noted that "unrelated, unsubstantiated claims raised by other employees at other times," including outside of work, and "directed toward other individuals at Allegiant not complained about by Plaintiff," were fully investigated by Allegiant and "did not create genuine issues of material fact." (DE 74 at pp. 29-30.) The District Court did not err in finding that the hodgepodge of unrelated, hearsay statements and comments by various employees offered by Kelley did not create any genuine issue of material fact concerning discrimination against Kelley.

---

that *plaintiff* was discriminated against based on race; "[a]t most, this evidence . . . support[ed] the conclusion that other employees ha[d] been discriminated against based on their race at work"); *Hughes v. City of Lake* City, No. 3:12-CV-158-J-32JBT, 2014 WL 1293525, at *5-6 (M.D. Fla. Mar. 28, 2014) (where other African American police officers' allegations regarding the City's treatment of them bore "little resemblance" to the plaintiff's allegations regarding the treatment by a different supervisor, that "me too" evidence at most proved discrimination against other employees, not the plaintiff); *Hamilton v. Coffee Health Group*, 949 F. Supp. 2d 1119, 1158 (N.D. Ala. June 6, 2013) (plaintiff's belief that co-worker was discriminated against by different decision-maker lacked in probative value)).

## IV.   THE DISTRICT COURT DID NOT ERR IN FINDING THAT APPELLANT DID NOT OFFER PROPER COMPARATORS

During her deposition, Kelley could not identify a single non-African American CSA who both (1) used a racist term and (2) was dishonest during an investigation, and who was not terminated. (DE 34 at ¶66.) Now, Kelley argues that J. Buch and S. Buch (both white) are proper comparators to Kelley. (PB at pp. 25-26.) Kelley argues the District Court "contort[ed]" the meaning of the term "comparator" by requiring that Kelley's proposed comparators—the Buch sisters—to have <u>both</u> used a racist term <u>and</u> be found dishonest. (PB at p. 25.) According to Kelley, this was "analytically incorrect," because it assumed that Kelley had in fact said something racist to J. Buch on November 20, 2022—but "[t]hat remains genuinely disputed." (*Id.*) In reality, there is no genuine "dispute" because three disinterested witnesses confirmed Kelley's act of invoking racism on November 20, 2022, and the District Court found that Mortimer's conclusion that Kelley had in fact invoked racism on November 20, 2022, was reasonable.

Kelley argues that to be similarly situated, the proposed comparators did not have to also have been dishonest. (PB at p. 26.) Kelley's reasoning for this premise? Kelley's belief that "Mortimer's conclusion regarding her dishonesty was a sham and that her complaints were not investigated in a manner similar to the investigation into her." (*Id.*) However, Kelley's belief is unsupported by any record evidence, only

by Kelley's speculations and arguments of counsel. This is clearly insufficient to create a genuine issue of material fact.

Kelley also argues: "The Buch sisters are apt comparators because they are two similarly situated white women who were not subjected to the investigation that Kelley was"; "neither sister was ever punished for anything related to Kelley's complaints. Nor is it disputed that Allegiant failed to reach a formal conclusion regarding Kelley's allegations." (*Id.*) In other words, Kelley claims that the Buch sisters also used racist terms (according to Kelley), but nothing happened to them. However, even crediting Kelley's version that both Buch sisters had, in the past, used racial terms, Kelley completely glosses over the fact that there is no record evidence that either was accused of or was found to have given dishonest, untruthful, and inconsistent statements during an internal company investigation. To use comparable evidence, the other employees must be similarly situated to plaintiff in all material respects. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220-21 (11th Cir. 2019). Even assuming the Buch sisters were not terminated for making any alleged racial statements, neither was Kelley—and "[t]he difference is not simply semantics." *E.g.*, *Perry v. Walmart Inc.*, No. 218CV606FTM29NPM, 2020 WL 1158719, at *7 (M.D. Fla. Mar. 10, 2020) ("Even assuming other employees were not disciplined for using profanity in the distribution center, neither was plaintiff. Rather, plaintiff was disciplined for allegedly using profanity in reference to another

employee, and then subsequently lying about it. The difference is not simply semantics."); *Naraine v. City of Hollywood*, No. 21-CV-60313-RAR, 2022 WL 3577069, at *9 (S.D. Fla. Aug. 19, 2022) (purported comparator not proper where, even if the comparator violated the employer's rules, there was no evidence he also made false statements during an internal investigation), *aff'd*, No. 22-13171, 2023 WL 6475507 (11th Cir. Oct. 5, 2023); *Stevenson v. Delta Air Lines, Inc.*, No. 116CV002571ATLTW, 2021 WL 2677018, at *13 (N.D. Ga. Apr. 13, 2021) (plaintiff and purported comparators were not similarly situated where there was no evidence that any of the comparators who violated the airline's workplace policy like the plaintiff also were dishonest or evasive during their respective internal investigations), *report and recommendation adopted*, No. 16-CV-2571-AT, 2021 WL 5168274 (N.D. Ga. Sept. 29, 2021), *aff'd*, No. 21-13814, 2023 WL 197052 (11th Cir. Jan. 17, 2023); *Jones v. Procter & Gamble Paper Products Co.*, No. 1:18-CV-046 (LAG), 2019 WL 11638413, at *9 (M.D. Ga. May 8, 2019) (purported comparators not similarly situated where, although they also were investigated for violations of employer's work rules and policies, there was no finding that they also lacked integrity and were dishonest during the investigation). The District Court did not err in finding that Kelley did not prove existence of comparators as a matter of law.

## V.  THE DISTRICT COURT DID NOT ERR IN FINDING THAT KELLEY COULD NOT SHOW PRETEXT

In its Summary Judgment Order, the District Court correctly focused on whether Allegiant (Mortimer) honestly believed Kelley's conduct amounted to dishonesty. (DE 74 at pp. 32-34.) Relying on the Eleventh Circuit precedent, the District Court correctly found that, even if Kelley maintained that she was not dishonest or was consistent in her statements (from her perspective), and even if Allegiant was wrong about Kelley giving dishonest and inconsistent statements during the company investigation, what mattered was Allegiant's honest belief that Kelley was dishonest during its investigation—not whether Kelley was actually dishonest. (DE 74 at pp. 32-33; see also argument and authority in Part II(C), *supra*.)

The District Court also discussed that Kelley's other proposed evidence of pretext—the hodgepodge of allegations regarding the slight variances across the breakroom incident witnesses' statements, Stacey's touching of Kelley's hair that was timely addressed and stopped, the alleged statements made during a sing-along at the karaoke bar that Kelley was not present for, the rumor about someone's comment about getting this 'N****r Bitch' fired" that Kelley was not present for but attributed to herself, and the rumors about a "race war" that Kelley denied having any knowledge of—and found that was not enough to show that Allegiant's reason for Kelley's termination was permeated by "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions," such that a reasonable factfinder could find it "unworthy of credence." (DE 74 at pp. 33-36.)

In arguing against the District Court's finding that Kelley had not offered sufficient evidence of pretext, Kelley once again argues she (1) exposed the discrepancies between the investigation into her allegations and that of others; and (2) proved that "the circumstances surrounding both her suspension and termination [were] intertwined with reporting racism at Allegiant-PIE." (PB at pp. 27-28.) Neither contention is supported by the record.

Kelley's argument about the "discrepancies" in the investigation presumably concerns her claim that Allegiant should have done something more during its investigation, for example, by interviewing S. Buch, J. Buch's brother, or someone by the name "Michael" ("Ace"). However, when asked in real time about the witnesses Mortimer could interview, Kelley repeatedly could not identify a single witness (DE 34 at ¶¶56, 61). "An investigation does not have to be perfect, and just because the accused proclaims [her] innocen[c]e does not obligate the employer to expand or extend the investigation indefinitely in hopes of finding at least one person who can support the accused." *Joseph v. Bd. of Regents of U. System of Georgia*, No. 1:20-CV-00502-VMC, 2023 WL 2393974, at *31 (N.D. Ga. Mar. 3, 2023) (citing *Johnson v. Reed Contracting Servs., Inc.*, No. 5:14-CV-2131-AKK, 2016 WL 5407999, at *8 (N.D. Ala. Sept. 28, 2016)), *aff'd sub nom. Joseph v. Bd. of Regents*

*of the U. System of Georgia*, 121 F.4th 855 (11th Cir. 2024); *see also Moser v. Fla. Dep't of Corr.*, 709 F. App'x 985, 987 (11th Cir. Sept. 25, 2017) (rejecting employee's claims that employer's investigation was flawed and subsequent report was defective by holding that "[w]e are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates [the] challenged employment decision." (internal quotations marks omitted)); *Chukes v. Sailormen Inc.*, 648 F. App'x 779, 782 (11th Cir. Apr. 15, 2016) (affirming grant of summary judgment for employer despite assuming the investigation leading to termination was "flawed"); *Graham v. Best Buy Stores*, 298 F. App'x 487, 496 (6th Cir. Oct. 22, 2008) (to prevail on summary judgment, defendant did not have to prove that plaintiff actually engaged in misconduct or show that its investigation was perfect; it needed only show that it decided to report the plaintiff to the police based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation).

Further, there is literally no record evidence aside from Kelley's conjecture that CEO Gallagher's receipt and single act of forwarding Kelley's December 19, 2022, email to the HR team for handling with an 8-word comment—"R. See below. Have u seen this. M."—somehow proves that Kelley's suspension and termination were intertwined with "reporting racism at Allegiant-PIE." As set forth above,

45

Kelley's December 19, 2022, email came to play to the extent that it further highlighted the inconsistencies of Kelley's statements during the investigation; however, there is zero evidence that the <u>act</u> of sending the email itself catalyzed or caused Kelley's suspension and termination. The District Court did not err in finding that Kelley had not presented sufficient evidence of pretext.

## VI.     THE DISTRICT COURT DID NOT ERR IN HOLDING APPELLANT HAD FAILED TO CREATE GENUINE ISSUES OF MATERIAL FACT WITH RESPECT TO HER CLAIM FOR RETALIATION

Kelley's only challenge with respect to the District Court's grant of summary judgment in favor of Allegiant on her retaliation claim is based on the argument that Allegiant suspended and terminated Kelley in close proximity to her December 15, 2022, written statement in which she for the first time claimed J. Buch had previously made racial statements, and that Mortimer began to call Kelley's honesty into question after learning about Kelley's "allegations and continued complaints."[19] (PB at pp. 28-29.) However, with respect to the complaints Kelley made during Allegiant's active, ongoing investigation into her own conduct, the Eleventh Circuit precedent makes clear that the "anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint." *Alvarez*, 610 F.3d at 1270;

---

[19] Kelley does not appear to challenge the District Court's findings with respect to any complaints that Kelley made before December 2022. (DE 74 at p. 37.)

*Breeden*, 532 U.S. at 272 (employers need not suspend previously planned actions because of intervening protected activity; "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality"); *Smith*, 565 F. App'x at 779 (no causal relation between filing of charge and being placed on administrative leave where employee was already on administrative leave when she filed charge and employer could subsequently proceed to terminate her despite pending charge). Allegiant's investigation into Kelley's conduct began before she made these complaints, and, with respect to any reasons it had to terminate Kelley, Allegiant remained free "to act on those reasons" after Kelley's complaints, as well.

With respect to Mortimer's conclusion that Kelley was dishonest during an internal investigation after reviewing her email to Gallagher, the District Court correctly observed that it was not the act of sending the email itself that triggered Kelley's termination, but the fact that the email highlighted Kelley's contradictory and inconsistent statements. (DE 74 at pp. 37-38.) The District Court correctly concluded there was no genuine issue of material fact with respect to Kelley's retaliation claim. (DE 74 at pp. 38-39.)

## VII. THE DISTRICT COURT'S ORDER DENYING APPELLANT'S MOTION TO COMPEL CEO GALLAGHER'S "APEX" DEPOSITION IS NOT PROPERLY BEFORE THIS COURT

Kelley argues the District Court erred in precluding the deposition of CEO Gallagher pursuant to the "Apex" doctrine. (PB at p. 2.) This issue on appeal arises from the Discovery Order denying Plaintiff's Motion to Compel Allegiant's CEO's deposition (DE 24, 39), an order not included in Appellant's Notice of Appeal. Importantly, the Federal Rules of Appellate Procedure and controlling Supreme Court precedent limit an appeal to the order(s) identified in the Notice of Appeal. Fed. R. App. P. 3(c)(1)(B) requires that a notice of appeal "designate the judgment— or the appealable order—from which the appeal is taken." Fed. R. App. P. 3(c)(1)(B); *see also Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1374-75 (11th Cir. 1983). This Court has observed that "where some portions of [an order] are expressly made a part of the appeal, [the Court] must infer that the appellant did not intend to appeal other unmentioned orders or judgments." *Seminole Tribe of Fla. v. Stranburg*, 799 F.3d 1324, 1343 (11th Cir. 2015) (quotation marks omitted) (quoting *Osterneck v. E.T. Barwick Industries, Inc.*, 825 F.2d 1521, 1529 (11th Cir. 1987) (citing *Mestre*, 701 F.2d at 1374-75))). The Supreme Court has also held that "Rule 3's dictates are jurisdictional in nature, and their satisfaction is a prerequisite to appellate review. Although courts should construe Rule 3 liberally when determining whether it has been complied with, noncompliance is fatal to an appeal." *Smith v. Barry*, 502 U.S.

244, 248 (1992) (emphasis added) (citation omitted). For these reasons, this issue is not properly before this Court, and should be ignored.

To the extent the Court chooses to entertain Kelley's argument on the merits, as set forth more fully herein, the Magistrate Judge correctly found that Appellant was not entitled to an "Apex" deposition of Allegiant's top executive. The summary judgment record evidence shows that a few hours after her December 19, 2022, suspension, Kelley emailed CEO Gallagher, alleging "ongoing racial tensions" at Allegiant and making other allegations. (DE 34 at ¶59.) Pursuant to his usual course of conduct, CEO Gallagher forwarded Kelley's employee concern to the HR team for handling with a single comment: "R. See below. Have u seen this. M." (DE 34 at ¶60; DE 36-14 at p. 16.) And that is it: there is absolutely no evidence that CEO Gallagher participated in Kelley's employment situation or Allegiant's investigation of J. Buch's allegations against Kelley and Kelley's competing allegations against J. Buch in any other way.

After considering Appellant's argument that Gallagher was a fact witness possessing unique knowledge of the issues in this case, and Allegiant's argument that Gallagher's single act of receipt and forwarding of Kelley's email to others for handling was an insufficient rationale to compel the deposition of Allegiant's top executive, the Magistrate Judge agreed with Allegiant. (DE 39 at pp. 3-5 ("Courts in this district have held that a Plaintiff who merely sends correspondence to a high-

level officer has not established that that officer has unique knowledge of the issues in the case." (collecting cases)).) *See, e.g.*, *Chick-Fil-A, Inc. v. CFT Dev., LLC*, No. 5:07-CV-501-OC-10GRJ, 2009 WL 928226, at *3 (M.D. Fla. Apr. 3, 2009) ("Generally, because the CEO of a large corporation is familiar with the big picture of the operations of a company—and is not familiar with the day to day operations of a business—most courts have fashioned a test that requires the party seeking the deposition of a CEO to show that the executive has 'unique or superior knowledge of discoverable information.'" (denying the defendants' request to depose the company's President and COO where the evidence showed only that she received, did not personally respond to, and forwarded the communication at issue to someone else within the company for handling) (citing *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979) (protective order granted barring deposition of President of drug company because he lacked direct knowledge of the facts in dispute, and other employees had more direct knowledge); *Lewelling v. Farmers Ins. Of Columbus, Inc.*, 879 F.2d 212, 218 (6th Cir. 1989) (protective order barring plaintiffs from deposing their employer's CEO, who lacked knowledge about any relevant facts))).

Additionally, the Magistrate Judge noted that Appellant had not attempted to obtain the information she sought through a deposition of CEO Gallagher via less intrusive means. (DE 39 at p. 5.) For example, Appellant asked to depose only Mortimer, Peterson, and J. Buch, and did not seek to depose a Rule 30(b)(6) representative of

Allegiant; did not question Mortimer about the email at issue (which was ultimately forwarded to her) during Mortimer's deposition; and did not propound any interrogatories to Allegiant about the email during the discovery period. (*Id.*) For these additional reasons, the Discovery Order was proper and should not be reversed.

Dated: April 1, 2025.

**RESPECTFULLY SUBMITTED,**

By:  /s/ *Viktoryia Johnson*
Dawn Siler-Nixon
Florida Bar No. 993360
DSiler-Nixon@fordharrison.com
Viktoryia Johnson
Florida Bar No. 0125545
vjohnson@fordharrison.com

FORDHARRISON, LLP
401 E. Jackson St., Suite 2500
Tampa, Florida 33602
Telephone: (813) 261-7800
Facsimile: (813) 261-7899
Attorneys for Appellee

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

I certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, as this brief contains 12,560 words, including text in picture (screenshot) excerpts, and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), as this brief has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman 14-point font.

*/s/ Viktoryia Johnson*
Attorney

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on April 1, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send an electronic copy to those listed below:

Jonathan E. Pollard
Christopher S. Prater
Michael A. Boehringer
Pollard PLLC
401 E. Las Olas Blvd., #1400
Fort Lauderdale, FL 33301
jpollard@pollardllc.com
cprater@pollardllc.com
mboehringer@pollardllc.com

/s/ *Viktoryia Johnson*
Attorney